[No. B200933. Second Dist., Div. Three. Sept. 29, 2008.]

In re H.M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
H.M., Defendant and Appellant.

## Counsel

Lea Rappaport Geller, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**ALDRICH, J.**—H.M., a minor, appeals from the order declaring him a ward of the court (Welf. & Inst. Code, § 602) entered following the juvenile court's finding he possessed a concealable firearm (Pen. Code, § 12101, subd. (a)(1)). The juvenile court ordered H.M. placed in the camp community placement program for a maximum confinement period of three years two months. H.M. contends the juvenile court erred by denying his suppression motion. We disagree, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 2, 2007, the People filed a petition under Welfare and Institutions Code section 602 alleging that H.M. possessed a concealable firearm on June 28, 2007. (Pen. Code, § 12101, subd. (a)(1).) H.M. filed a motion to suppress evidence (Welf. & Inst. Code, § 700.1). At a combined hearing on both the suppression motion and the merits, the following evidence was adduced.

On June 28, 2007, at approximately 3:45 p.m., Los Angeles Police Department Officer Edgar Hernandez, who was assigned to the Rampart gang detail, was on patrol in the area of 3rd Street and Alexandria Avenue in Los Angeles with his partner, Officer Godoy. The area was a "stronghold" of the 18th Street gang and was covered by the 18th Street gang injunction. Hernandez was at the location due to "numerous complaints from citizens . . . about gang members, especially 18th Street, shooting at passing vehicles, selling narcotics and just hiding out." Hernandez had personally made numerous arrests in the area for robbery, vandalism, weapons possession, and narcotics activity.

As Hernandez and Godoy were citing several 18th Street gang members for tobacco possession, Detective George Magallon, who was also assigned to the Rampart division, came by to speak with them regarding an apparent gang-related shooting that had occurred the previous day. Magallon had worked as a detective with the Rampart gang investigative team for three months, and had worked patrol in the area between 1999 and 2003. As Officer Hernandez and Detective Magallon spoke, they observed 14-year-old H.M. sprint across 3rd Street through heavy traffic towards them, causing motorists to slow and honk. H.M. was sweating profusely and kept "looking back." His facial expression suggested he was "trying to get away from something." He appeared confused and nervous, as if "something was happening."

Officer Hernandez had encountered H.M. on several prior occasions and knew his home, which was approximately one-half block away, was an 18th Street gang "stronghold." H.M. had admitted to Hernandez that he was an 18th Street gang member, and had a tattoo indicating gang membership on his wrist. Hernandez had previously served H.M. with the 18th Street gang injunction at his home and, within two weeks thereafter, had arrested him for unlawfully associating with gang members.

Detective Magallon had not had prior contacts with H.M. and did not recognize him. However, as H.M. was running, either Hernandez or Godoy looked in H.M.'s direction and mentioned H.M.'s name in a conversational tone. Because the other officer recognized H.M., Magallon concluded he had had contacts with H.M. in the past.

Detective Magallon immediately detained H.M. for crossing the street illegally, but was "more concerned" about why H.M. was running. Magallon "was unsure if he had robbed someone, if he had been shot at or if he had shot at someone." Based on H.M.'s demeanor and behavior, and the fact they were in gang territory, Magallon "believed [H.M.] was running away from something, whether he had just . . . victimized someone or he had been a victim." Because the area was "documented 18th Street gang territory," Magallon did not know "if maybe rival gang members were in the area and maybe there was a victim a few blocks away. I just wanted to investigate if any criminal activity had taken place." Magallon's concerns were based on "[j]ust knowing the area, prior experience, having worked that area; [H.M.'s] demeanor, his actions." Magallon decided to perform a patsearch because he believed he needed to investigate whether a crime had occurred. He explained, "If some type of crime had taken place, I thought that a weapon had been used," either by or against H.M.

Magallon grabbed H.M.'s hand or wrist and ordered him to step towards a wall. When Magallon patsearched H.M., he discerned a hard object in H.M.'s front trouser pocket and asked what it was. H.M. replied, "It's a .25, sir." Magallon then retrieved a small semiautomatic handgun, which was loaded with six live rounds.

H.M. was arrested. After being advised of and waiving his *Miranda*[1] rights, during an interview at the police station H.M. told Officer Hernandez that he had found the gun five days earlier and kept it for protection from his enemies.

The juvenile court denied the suppression motion. It concluded there was no dispute the initial stop for the traffic violation was legal. The facts that H.M. was running through traffic in an area known for 18th Street gang activity, was looking around, appeared nervous, and was known to one of the officers, coupled with Magallon's experience in the area and the fact he was present to investigate a shooting that had occurred one block away the day before, justified the patsearch.

As noted, the juvenile court sustained the petition, declared the offense a felony, and placed H.M. in the camp community placement program for a period of confinement not exceeding three years two months.

## DISCUSSION

H.M. contends the juvenile court erred by denying his suppression motion, and therefore the court's order sustaining the July 2, 2007 petition must be reversed. We disagree.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel. (U.S. Const., 4th Amend.; *Terry v. Ohio* (1968) 392 U.S. 1, 8–9 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *People v. Maury* (2003) 30 Cal.4th 342, 384 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Camacho* (2000) 23 Cal.4th 824, 829–830 [98 Cal.Rptr.2d 232, 3 P.3d 878].) On review of the trial court's denial of a suppression motion, we defer to the trial court's express or implied factual findings if supported by substantial evidence, but exercise our independent judgment to determine whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Maury, supra,* at p. 384; *People v. Camacho, supra,* at p. 830; *People v. Jenkins* (2000) 22 Cal.4th 900, 969 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Medina* (2003) 110 Cal.App.4th 171, 175 [1 Cal.Rptr.3d 546].) Challenges to the admissibility of a search or seizure must be evaluated solely under the Fourth Amendment. (*People v. Carter* (2005) 36 Cal.4th 1114, 1141 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

It is clear that Detective Magallon's initial stop of H.M. was lawful, and H.M. does not argue to the contrary. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 [145 L.Ed.2d 570, 120 S.Ct. 673].) " 'Although police officers may not arrest or search a suspect without probable cause and an exception to the warrant requirement, they may temporarily detain a suspect based only on a "reasonable suspicion" that the suspect has committed or is about to commit a crime. [Citations.]' Such detentions are permitted, notwithstanding the Fourth Amendment's requirements of probable cause and a search warrant, because they are "limited intrusions" that are "justified by special law enforcement interests." [Citations.]' [Citation.]" (*People v. Durazo* (2004) 124 Cal.App.4th 728, 734 [21 Cal.Rptr.3d 516].) An ordinary traffic stop is treated as an investigatory detention, i.e., a *"Terry* stop." (*Ibid.*) A *Terry* stop is justified if it is based on at least reasonable suspicion that the individual has violated the Vehicle Code or some other law. (*Id.* at pp. 734–735.) Here, H.M.'s run across the street constituted a traffic violation for which he could lawfully be stopped. (See Veh. Code, § 21954 [pedestrians not crossing in a crosswalk are required to yield the right-of-way to all vehicles so near as to constitute an immediate hazard]; *People v. Superior Court (Brown)* (1980) 111 Cal.App.3d 948, 951 [168 Cal.Rptr. 915] [where officer saw pedestrian commit a traffic violation, he had the right and duty to detain and cite].)

H.M. contends, however, that even if the initial stop was lawful, the subsequent patsearch violated the Fourth Amendment. According to H.M., after he was stopped for the traffic infraction, "he ought to have been told why he was being stopped, given a citation and then been allowed to leave

freely." (See *People v. McGaughran* (1979) 25 Cal.3d 577, 587 [159 Cal.Rptr. 191, 601 P.2d 207]; *People v. Medina, supra,* 110 Cal.App.4th at p. 176.)

■ When an officer reasonably suspects that an individual whose suspicious behavior he or she is investigating is armed and dangerous to the officer or others, he or she may perform a patsearch for weapons. (*Terry v. Ohio, supra,* 392 U.S. at pp. 24, 30; *Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, 320 [60 Cal.Rptr.3d 469]; *People v. Dickey* (1994) 21 Cal.App.4th 952, 955–956 [27 Cal.Rptr.2d 44]; *People v. Garcia* (2006) 145 Cal.App.4th 782, 786 [52 Cal.Rptr.3d 70].) The sole justification for the search is the protection of the officer and others nearby, and the search must therefore be confined in scope to an intrusion reasonably designed to discover weapons. (*Terry v. Ohio, supra,* at p. 29.) A patsearch is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." (*Id.* at p. 17, fn. omitted.) On the other hand, law enforcement officers have a legitimate need to protect themselves even where they may lack probable cause for an arrest. (*Id.* at p. 24.) The officer has an immediate interest in taking steps to ensure that the person stopped "is not armed with a weapon that could unexpectedly and fatally be used" against the officer. (*Id.* at p. 23.)

Such a limited frisk for weapons is justified where the officer "can point to specific and articulable facts which, considered in conjunction with rational inferences to be drawn therefrom, give rise to a reasonable suspicion that the suspect is armed and dangerous." (*People v. Medina, supra,* 110 Cal.App.4th at p. 176; see *Ybarra v. Illinois* (1979) 444 U.S. 85, 92–93 [62 L.Ed.2d 238, 100 S.Ct. 338]; see *Terry v. Ohio, supra,* 392 U.S. at p. 21; *People v. Lindsey* (2007) 148 Cal.App.4th 1390, 1395–1396 [56 Cal.Rptr.3d 619]; *People v. Lopez* (2004) 119 Cal.App.4th 132, 135 [13 Cal.Rptr.3d 921]; *People v. Dickey, supra,* 21 Cal.App.4th at p. 956; *People v. Miranda* (1993) 17 Cal.App.4th 917, 927 [21 Cal.Rptr.2d 785] [minor traffic offenses do not reasonably suggest the presence of weapons, and an officer may not search a driver unless the objective circumstances furnish reasonable grounds to believe the driver is armed or dangerous and may gain immediate control of a weapon].)

■ "[T]he officer need not be absolutely certain that the individual is armed; the crux of the issue is whether a reasonably prudent person in the totality of the circumstances would be warranted in the belief that his or her safety was in danger." (*People v. Avila* (1997) 58 Cal.App.4th 1069, 1074 [68 Cal.Rptr.2d 432]; see *Terry v. Ohio, supra,* 392 U.S. at p. 27.) Reasonable suspicion must be based on "commonsense judgments and inferences about human behavior." (*Illinois v. Wardlow, supra,* 528 U.S. at p. 125.) The determination of reasonableness is "inherently case-specific." (*People v.*

*Durazo, supra,* 124 Cal.App.4th at p. 735.) An inchoate and unparticularized suspicion or hunch is not sufficient, nor is the fact the officer acted in good faith. (*Terry v. Ohio, supra,* at pp. 22, 27.) Where specific and articulable facts are absent, the patsearch cannot be upheld. (*People v. Dickey, supra,* 21 Cal.App.4th at p. 956.) Whether a search is reasonable must be determined based upon the circumstances known to the officer when the search was conducted. (*In re Jaime P.* (2006) 40 Cal.4th 128, 133 [51 Cal.Rptr.3d 430, 146 P.3d 965].)

Here, the trial court found the patsearch justified because (1) H.M. was running through traffic and nervously looking around, causing Detective Magallon to believe he was involved in some kind of criminal activity, either as a victim or perpetrator; (2) the area was known for gang activity; (3) H.M. was "known to" one of the officers present, and Magallon heard that officer say H.M.'s name; and (4) there had been a shooting a block away the previous day.

We conclude the trial court correctly held the detective had a reasonable suspicion H.M. was armed. H.M. was not stopped solely because he committed a minor traffic violation. H.M. was also stopped because of his unusual, suspicious behavior. Magallon observed H.M. dashing through heavy traffic, causing motorists to honk and swerve. H.M.'s facial expression and his repeated glances behind as he ran suggested he was frightened and fleeing from a dangerous situation. The fact he was sweating profusely and appeared confused and nervous reinforced this impression. Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. (*Illinois v. Wardlow, supra,* 528 U.S. at p. 124.) Viewed objectively, through the lens of common sense and experience, H.M.'s odd behavior strongly suggested criminal activity was afoot. Indeed, we can conceive of few hypotheses explaining H.M.'s conduct, other than that he was either a perpetrator or a victim fleeing a crime scene. Moreover, Magallon was aware H.M. was known by name to one of his fellow officers, suggesting H.M. had had sufficient previous contacts with police that he was known to the other officer on sight. This fact reasonably added to Magallon's suspicion that H.M. was involved in criminal activity. (Cf. *Adams v. Williams* (1972) 407 U.S. 143, 147 [32 L.Ed.2d 612, 92 S.Ct. 1921] [reasonable cause for a stop and frisk can be based on information supplied by another person].)

Relying on Justice Stevens's dissent in *Illinois v. Wardlow, supra,* 528 U.S. 119, H.M. urges that "A pedestrian may break into a run for a variety of reasons—to catch up with a friend a block or two away, to seek shelter from

an impending storm, to arrive at a bus stop before the bus leaves, to get home in time for dinner, to resume jogging after a pause for rest, to avoid contact with a bore or a bully, or simply to answer the call of nature—any of which might coincide with the arrival of an officer in the vicinity." (*Id.* at pp. 128–129 (dis. opn. of Stevens, J.).) That may well be true, but here it appeared to the experienced detective that H.M. was nervous, looking behind him, and running "really fast" from something, not simply out for a relaxing jog or attempting to outrun an impending storm. Absent evidence to the contrary, we think an experienced officer is readily able to discern whether such flight is more indicative of innocent behavior or consciousness of guilt. Likewise, the fact Magallon was not sure whether H.M. was the perpetrator or the victim of a crime is immaterial; "[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957]; see *Illinois v. Wardlow, supra*, at p. 125; *People v. Souza* (1994) 9 Cal.4th 224, 233 [36 Cal.Rptr.2d 569, 885 P.2d 982].)

■ Further, the area in which H.M.'s suspicious conduct was observed was the subject of a gang injunction, and was well known to Magallon as a stronghold of the 18th Street gang. Officers were in the area to investigate because of numerous citizen complaints about various crimes, including gang members shooting at passing vehicles. In fact, there had been a gang-related shooting the previous day. To be sure, the mere fact a person is located in a high-crime area when stopped by police does not, by itself, give rise to a reasonable suspicion that the individual is armed. (*Illinois v. Wardlow, supra*, 528 U.S. at p. 124 ["An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."]; *People v. Perrusquia* (2007) 150 Cal.App.4th 228, 233 [58 Cal.Rptr.3d 485]; *People v. Medina, supra*, 110 Cal.App.4th at p. 177.) Nonetheless, the character of the locale where the stop occurs is a factor to be considered in a Fourth Amendment analysis. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, . . . the fact that the stop occurred in a 'high crime area' " is one of the "relevant contextual considerations in a *Terry* analysis." (*Illinois v. Wardlow, supra*, at p. 124; see also *People v. Souza, supra*, 9 Cal.4th at p. 240 ["An area's reputation for criminal activity is an appropriate consideration in assessing whether an investigative detention is reasonable under the Fourth Amendment."]; *People v. Medina, supra*, 110 Cal.App.4th at p. 177.)

Here, the location of the stop is an especially significant factor demonstrating the officer had reasonable suspicion to stop and frisk. We cannot overlook the reality that in the 40 years since *Terry* was decided, the problem of criminal street gangs has escalated. It is common knowledge that in Los Angeles, gangs have proliferated and gang violence is rampant. (See, e.g., Barrett, *Living in Fear: Gangs Keep Stranglehold on Southland Cities*, L.A. Daily News (Sept. 28, 2004) p. N1 [describing "epidemic of gang violence" in Southern California, including frequent gunfire and shootings].) As recognized by our Supreme Court, the threat posed by violent street gangs "is of the most serious dimensions and state policy urgently seeks its alleviation. The Legislature has said as much, and the Official Reports are replete with examples of the problem." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1216 [63 Cal.Rptr.3d 99, 162 P.3d 610].) " 'Criminal street gangs have become more violent, bolder, and better organized in recent years.' " (*People v. Briceno* (2004) 34 Cal.4th 451, 462 [20 Cal.Rptr.3d 418, 99 P.3d 1007], quoting Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (b), p. 119.) According to data compiled by the Los Angeles Police Department, there are more than 250 active gangs in the City of Los Angeles alone, with a combined membership of over 26,000. Over the last five years, there have been over 23,000 verified violent gang crimes in the city, including 784 homicides, nearly 12,000 felony assaults, and approximately 10,000 robberies. (<http://www.lapdonline.org/get_informed/content_basic_view/1396> [as of Sept. 29, 2008].)

It is likewise common knowledge that members of criminal street gangs often carry guns and other weapons. "When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them." (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056 [88 Cal.Rptr.2d 482]; see also *People v. Hernandez* (2005) 134 Cal.App.4th 474, 482 [36 Cal.Rptr.3d 59] [noting the Legislature enacted Pen. Code, § 12022.53 " 'in recognition of the serious threats posed to the citizens of California by gang members using firearms' "].) Detective Magallon, who was assigned to the Rampart gang investigative team and had patrolled a neighborhood that was the asserted territory of the 18th Street gang, was certainly aware of the increased likelihood of encountering weapons in the area.

Officers in an area plagued by violent gang activity need not ignore the reality that persons who commit crimes there are likely to be armed. "[T]he fact that an area involves increased gang activity may be considered if it is relevant to an officer's belief the detainee is armed and dangerous. While this factor alone may not justify a weapon search, combined with additional factors it may." (*People v. King* (1989) 216 Cal.App.3d 1237, 1241 [265 Cal.Rptr. 370]; see *In re Frank V.* (1991) 233 Cal.App.3d 1232, 1241 [285

Cal.Rptr. 16].) Given the realities of police work in such areas, we believe it is eminently reasonable for an officer to suspect a person who appears to have been involved in a crime may also be armed and dangerous. In *Terry*, the officer observed two individuals pacing back and forth in front of a store, peering into the storefront windows, and repeatedly conferring with each other. This conduct suggested they were casing the store and "contemplating a daylight robbery—which, it is reasonable to assume, would be likely to involve the use of weapons . . . ." (*Terry v. Ohio, supra*, 392 U.S. at p. 28.) Similarly, here, it was reasonable for Magallon to assume that a crime committed in a gang stronghold would involve a weapon, and that a person fleeing from such a crime would likely be armed. As explained in *Souza*, " 'we must allow those we hire to maintain our peace as well as to apprehend criminals after the fact, to give appropriate consideration to their surroundings and to draw rational inferences therefrom, unless we are prepared to insist that they cease to exercise their senses and their reasoning abilities the moment they venture forth on patrol.' [Citation.]" (*People v. Souza, supra*, 9 Cal.4th at p. 241, citing *People v. Holloway* (1985) 176 Cal.App.3d 150, 155 [221 Cal.Rptr. 394].) "Failure to cursorily search suspects for weapons in a confrontation situation in an area where gang activity and weapon usage is known from the officers' past experience would be most careless." (*In re Stephen L.* (1984) 162 Cal.App.3d 257, 260 [208 Cal.Rptr. 453].) Officers are not required to take unnecessary risks in the performance of their duties. (*Terry v. Ohio, supra*, 392 U.S. at p. 23.) When an officer observes conduct giving rise to a reasonable suspicion an individual is involved in criminal activity, and that activity occurs in an area known for recent, violent gang crime, these facts together go a long way toward establishing reasonable suspicion the individual is armed.

H.M. points to authorities which have repeatedly articulated that the fact the detention occurs in an area known for criminal activity cannot transform otherwise innocent circumstances into circumstances justifying seizure of an individual. (*People v. Bower* (1979) 24 Cal.3d 638, 645 [156 Cal.Rptr. 856, 597 P.2d 115] [" 'high crime area' factor" is not an activity of an individual and must be appraised with caution]; *In re Tony C., supra*, 21 Cal.3d at p. 897 [high-crime area justification is easily subject to abuse; "[a] day-old burglary report does not transform a residential neighborhood into a no man's land in which any passerby is fair game for a roving police interrogation . . ."]; *People v. Medina, supra*, 110 Cal.App.4th at p. 174.)

But here, the locale did not transform innocent behavior. H.M. was *not* stopped and frisked merely because he was in gang territory, or as a matter of routine procedure. To the contrary, as we have discussed, H.M.'s curious

activities strongly suggested criminal activity was afoot, leading an experienced officer to conclude H.M. might well be armed. These circumstances distinguish this case from cases such as *People v. Perrusquia, supra*, 150 Cal.App.4th 228, and *People v. Medina, supra*, 110 Cal.App.4th 171. In *Perrusquia*, factors unrelated to the defendant—the nature of the location and a recent string of robberies—formed the primary basis for the officer's detention of the defendant. (*People v. Perrusquia, supra*, at p. 233.) In *Medina*, an officer stopped the defendant for driving with a broken taillight. Although there " 'wasn't anything specific' " about Medina that led the officer to conclude he might be armed, the officer patsearched him as a matter of " 'standard procedure' " because they were in a " 'high-gang location' " at night. (*Id.* at pp. 175, 177.) *Medina* concluded that although Medina was lawfully stopped, the frisk violated the Fourth Amendment because minor traffic offenses do not reasonably suggest the presence of weapons. (*Medina*, at pp. 176–177.) In contrast to these cases, Magallon's suspicions were aroused based on factors directly related to H.M., i.e., his suspicious behavior and his prior contacts with police.

■ In sum, H.M. was running through traffic in a manner that objectively and strongly suggested he was fleeing some type of criminal activity. The area was an 18th Street gang stronghold. Magallon was aware of a recent gang-related shooting, and also knew H.M. was known to one of his fellow officers. Magallon had the experience and knowledge of the area to make reasonable inferences and commonsense judgments from these facts. (See *Illinois v. Wardlow, supra*, 528 U.S. at p. 125.) Thus, specific, articulable facts supported the detective's reasonable belief that H.M. had been involved in a crime, and was likely armed.

As *Terry* explained, "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives." (*Terry v. Ohio, supra*, 392 U.S. at pp. 23–24, fn. omitted.) That "long tradition" has clearly not diminished today. Common sense suggests that persons who are fleeing from a crime in an area known for violent gang crime are often armed. The totality of the circumstances gave rise to a reasonable suspicion, based on specific and articulable facts, that H.M. was armed, and Magallon was justified in conducting the brief, limited patsearch. The trial court properly denied the motion to suppress.[2] Accordingly, the juvenile court's order sustaining the allegation that H.M. possessed a firearm in violation of Penal Code section 12101, subdivision (a)(1), is affirmed.

---

[2] Given our conclusion, we need not reach the People's contention that the patsearch did not have to be supported by reasonable suspicion because H.M. was on probation and subject to a search condition.

## DISPOSITION

The juvenile court's order finding true the allegation that H.M. possessed a concealable firearm (Pen. Code, § 12101, subd. (a)(1)) is affirmed.

Klein, P. J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 23, 2008, S167394. Werdegar, J., did not participate therein.