Filed 4/29/21  In re R.L. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re R.L., a Person Coming Under the Juvenile Court Law. | B297787 |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>R.L.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. TJ23069) |

APPEAL from an order of the Superior Court of Los Angeles County, Catherine J. Pratt, Judge.  Affirmed.

Mary Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Kathy S. Pomerantz, Deputy Attorneys General for Plaintiff and Respondent.

—————————————

## INTRODUCTION

The juvenile court found true allegations that R.L. unlawfully possessed a loaded firearm and live ammunition. R.L. argues the police obtained the firearm and ammunition from an unlawful detention and search, and the trial court erred in denying his motion to suppress. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The People filed a petition pursuant to Welfare and Institutions Code section 602 alleging that R.L. committed the crimes of possession of a firearm by a minor (Pen. Code, § 29610, a felony; count 1) and possession of live ammunition by a minor (Pen. Code, § 29650, a misdemeanor; count 2). R.L. denied the allegations and filed a motion to suppress.

A.   *Officer Carson's Testimony*

The trial court heard R.L.'s motion to suppress on December 6, 2018 at a combined hearing on the motion to suppress and adjudication of the petition. Los Angeles Police Officer Jennifer Carson testified at the hearing. No other witnesses testified.

Carson had been a police officer for more than nine years, and had been assigned to the southeast division gang detail for four years. Carson's assignment included the Avalon Garden Crips gang and the 89 Family Swan Bloods gang, which Carson

2

testified are neighboring rival gangs. Carson testified those gangs had been involved in a "gang war" that included several shootings and homicides in the prior year.

On April 26, 2018 Carson and her partner Officer Joel Dominguez were on duty near the Avalon Gardens Housing Development. Carson was "intimately familiar" with the development and spent "a good portion of her shift patrolling that area." Carson was also "familiar with the people that reside in the development and the people that hang out in the development and do not live there." Both Carson and her patrol and gang unit partners had recovered firearms in the development.

In "the weeks and . . . few days" before April 26, 2018, a series of armed robberies had occurred on Avalon Boulevard "right outside" the development. The robberies had been committed by "young juvenile" Black males between the ages of 14 and 17. The suspects were armed with handguns. After committing the robberies, the suspects ran into the development. Carson and Dominguez were "specifically working on investigating those crimes" when they drove into the development on April 26, 2018 at approximately 8:00 p.m.

As Carson and Dominguez drove into the development, they observed a group of five people standing in front of one of the development's housing units. Several large "no trespassing" signs were posted throughout the development, including two or three signs in the area where the group had gathered. Carson recognized four of the individuals as members of the Avalon Garden Crips gang who did not live in the development, but "often . . . loiter[ed] and trespass[ed] and h[u]ng out in that area."

As the officers entered the development, one of the group members, whom Carson later identified as R.L., "seemed to notice

3

[the] police car." As he noticed the officers' car, R.L. "looked at [the officers] and then turned and walked away from the group." Carson testified that in her experience, and combined with other factors such as a person's company, location, and other events in the area, an individual who immediately walks away from police officers "can be . . . trying to avoid contact [with the police] because he's in possession of some type of contraband."

Carson did not recognize R.L. and was "reasonably sure" he did not live in the development. As R.L. walked away from Carson, she called him back over to her. Carson detained R.L. because he "very closely matched" the physical description of the robbery suspects, Carson did not recognize him and did not believe he lived in the development, and R.L. attempted to avoid contact with the police.[1]

R.L. complied with Carson's request that he stop and return. Carson spoke briefly to R.L. and then conducted a pat search. Carson testified that she conducted the pat search because she and Dominguez were "outnumbered by the number of individuals that were detained," and they were in a gang area that was at the time the subject of "a violent gang war that had resulted in numerous shootings and recoveries."

Carson's pat search included R.L.'s backpack, which he was wearing on his back. Carson testified that she felt a firearm in the backpack before she removed it from R.L.'s back, "just based on manipulating and feeling the outside of the backpack, the object inside, the size, shape and weight was consistent with that of a firearm." Carson opened R.L.'s backpack and found a loaded

---

[1] Carson testified the other individuals with whom R.L. had been standing were "too old" to match the description of the robbery suspects.

semiautomatic firearm.  Carson testified that the encounter with R.L. lasted less than five minutes.

B.     *Officer Carson's Body Camera Footage*

Carson wore a body camera during her encounter with R.L. Defense counsel played footage from Carson's body camera at the suppression hearing.[2]

The relevant portion of the footage runs approximately one minute thirty seconds.  The footage shows Carson exiting the police car and walking towards R.L., who is standing on a sidewalk wearing a backpack.  Four other individuals stand at a distance.  As Carson approaches R.L., he turns and walks away. Carson asks R.L. where he is going; R.L. responds, "Nowhere. My house."

The footage depicts Carson grabbing the top of R.L.'s backpack with her left hand and removing it from his back.  From

---

[2]     We granted R.L.'s motion to augment the appellate record with Carson's body camera footage, which was played in the trial court and admitted by reference (Defense Exhibit A), and a corresponding transcript (Defense Exhibit B).  After R.L. and the People filed their respective appellate briefs, R.L. filed a corrected motion to augment because he had mistakenly submitted Dominguez's body camera footage with his first motion to augment.  We granted R.L.'s corrected motion, striking Dominguez's footage and augmenting the record to include Carson's footage (Corrected Defense Exhibit A).

After R.L. filed his reply brief, we granted his request to file a corrected opening brief addressing the corrected augmented record.  We also granted the People's request to file a supplemental letter brief addressing the corrected augmented record and denied R.L.'s request to file a response to that supplemental brief.

5

this point, Carson and R.L. are standing so close together that Carson's actions can be only partially gleaned, largely from shadows and sounds in the footage. Carson appears to be holding R.L. with her right hand. Carson passes the backpack to her right hand, lowers the backpack to the ground, and places R.L.'s hands behind his back. Carson remains standing immediately next to R.L.; she lifts the backpack and appears to manipulate it and then search it. As she places the backpack back on the ground, Dominguez approaches Carson and R.L. from the direction of the other four individuals. Carson places handcuffs on R.L., and Dominguez pats R.L.'s torso and pockets. Carson searches the backpack again and then raises an object for Dominguez to see. The officers walk R.L. to their police car.

Carson testified that the footage "doesn't cover a large portion of what happened" when the officers drove into the development. Carson testified that before R.L. appears in the footage, the officers had already seen him, and R.L. had already walked away from the group, between two buildings, and had emerged on the sidewalk where he first appears in the footage.

C.  *The Trial Court Denies R.L.'s Motion To Suppress and Sustains the Petition*

The trial court denied R.L.'s motion to suppress. The trial court ruled:

> "First of all, it is a certain housing project in a known gang area. This is an experienced officer who had worked in that area for a period of time, has familiarity with the people who live there, don't live there, may be gang members, may not be gang members. There have been reports of crimes very recent to this date that do involve weapons. The

6

descriptions of the persons involved in those crimes is very general. Essentially, all we know is they are male blacks and they are young, which is, I think, too general to justify on its own a temporary detention of all male blacks in that area.

"But coupled with the fact that this officer does have some knowledge of the area and the residents of the area, she did distinguish him from the others that he was standing with, and that she indicated he was the only one who she felt was young enough to fit the description. And I think, significantly, she has indicated that there are 'no trespassing' signs that are posted and enforced in that area. . . .

"The question is whether or not there was a reasonable suspicion that justified the temporary detention. Once the temporary detention has occurred, I think the pat-down search under *Terry v. Ohio* [(1968) 392 U.S. 1] is legitimate. . . .

"I think that in the totality of the circumstances, in this circumstance there is a reasonable suspicion to at least do an encounter with him."

Neither party presented additional evidence regarding the adjudication. The trial court found the allegations of the petition true and sustained counts 1 and 2. The court declared R.L. a ward of the court and placed him at home on probation.

R.L. appealed the trial court's order denying the motion to suppress and sustaining the petition.

## DISCUSSION

A.   *Standard of Review*

"'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence.  [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.'"  (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223; accord, *People v. Ayala* (2000) 23 Cal.4th 225, 255 [on motion to suppress, appellate court reviews trial court's factual determinations ""'under the deferential substantial-evidence standard'""].)

B.   *The Trial Court Properly Denied the Motion To Suppress*

   1.   *The detention was lawful*

"""A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity."""  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)  "Even in a general sense, the reasonable suspicion standard . . . is not a particularly demanding one, but is, instead, 'considerably less than proof of wrongdoing by a preponderance of the evidence.'  [Citation.] '. . . . [T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.'"  (*Id.* at p. 146.)

Carson's detention of R.L. was reasonable as part of her investigation of the recent armed robberies.  R.L. met the physical description of the suspects.  Contrary to R.L.'s claim,

Carson did not detain him based solely on his race. R.L., a teenager, also appeared to Carson to be the same age as the suspects. In addition, Carson observed R.L. loitering at night in the development into which the teenage suspects had escaped after each robbery, including a robbery a few days earlier. Carson, who regularly patrolled the development, did not recognize R.L. as a resident of, or regular visitor to, the development. Carson recognized R.L.'s four companions as known gang members. And when R.L. spotted Carson's police car he immediately walked away in what Carson could reasonably have concluded was an effort to avoid contact with the police. (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 125 ["[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite."].) The trial court did not err in finding that Carson articulated sufficient specific facts to warrant detaining R.L. (See *United States v. Cortez* (1981) 449 U.S. 411, 417-418 ["Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. . . . [T]he essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity"].)

2. *The pat search was lawful, and substantial evidence supports the trial court's finding that Carson discovered the firearm during the pat search*

When a police officer reasonably believes a suspect he or she "is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a

9

pat search "to determine whether the person is in fact carrying a weapon. . . ." (*Terry v. Ohio* (1968) 392 U.S. 1, 24 (*Terry*); accord, *Minnesota v. Dickerson* (1993) 508 U.S. 366, 373.)  The pat search is limited, however, to a search "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (*Terry,* at p. 29.)  "[T]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his [or her] investigation without fear of violence. . . ." (*Adams v. Williams* (1972) 407 U.S. 143, 146; see *In re H.M.* (2008) 167 Cal.App.4th 136, 143 ["[T]he sole justification for the search is the protection of the officer and others nearby, and the search must therefore be confined in scope to an intrusion reasonably designed to discover weapons"].)  A pat search for weapons "is justified where the officer 'can point to specific and articulable facts which, considered in conjunction with rational inferences to be drawn therefrom, give rise to a reasonable suspicion that the suspect is armed and dangerous.'" (*In re H.M.*, at p. 143.)

Carson's pat search of R.L. was reasonable under the circumstances.  Based on her four years with the southeast division gang detail, Carson knew when she detained R.L. that the Avalon Garden Crips and the 89 Family Swan Bloods were engaged in a gang war in the area that had included several shootings and homicides.  She and her partners had recovered firearms in the development.  Carson recognized the four people with whom R.L. was standing as members of the Avalon Garden Crips gang, and she observed that the gang members outnumbered the officers.  Carson further knew that several armed robberies had recently occurred immediately outside the development and that the armed suspects had escaped into the

development after committing the crimes.  R.L. met the age and physical description of the robbery suspects, and had attempted to avoid contact with Carson and Dominguez.  The trial court did not err in finding that Carson articulated sufficient specific facts supporting a reasonable suspicion R.L. was armed and dangerous.  (See *In re H.M.*, *supra*, 167 Cal.App.4th at p. 147 ["When an officer observes conduct giving rise to a reasonable suspicion an individual is involved in criminal activity, and that activity occurs in an area known for recent, violent gang crime, these facts together go a long way toward establishing reasonable suspicion the individual is armed"].)

R.L. argues that Carson's body camera footage contradicts her testimony that she felt an object consistent with a firearm during the pat search.  Carson testified she manipulated and felt the outside of R.L.'s backpack before she removed it from his back, and in the process felt an object consistent with a firearm. The footage shows Carson grabbing and lifting the backpack by its top handle after R.L. stops; it does not show Carson manipulating or feeling the outside of the backpack before removing it from R.L.'s back.  The footage appears to show Carson manipulate the backpack immediately after removing it from R.L.'s back as R.L. stands nearby.

Defense counsel elected not to cross-examine Carson about this issue.  We are thus left to compare Carson's unchallenged testimony with body camera footage that appears to undermine part of Carson's testimony, but is consistent with her testimony that she believed the backpack contained a firearm after manipulating and feeling the outside of the backpack.  The trial court evaluated Carson's live testimony in reaching its conclusion that Carson lawfully searched R.L's backpack.  The footage does

11

not warrant overturning the trial court's credibility determinations and factual findings.  (See *People v. Woods* (1999) 21 Cal.4th 668, 673 ["As the finder of fact in a proceeding to suppress evidence [citation], the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally reasonable. . . . [W]e defer to the superior court's express and implied factual findings if they are supported by substantial evidence . . . ."]; see also *People v. Brisendine* (1975) 13 Cal.3d 528, 541-543 [officers lawfully searched campers' backpacks for weapons where officers had to escort campers out of forest and could not ensure campers would not access backpacks during hike].)

## DISPOSITION

The order of the juvenile court is affirmed.


McCORMICK, J.*

We concur:


SEGAL, Acting P. J.


FEUER, J.

---

\*      Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.