Filed 8/5/21  Hennessey v. Rasmussen CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MAUREEN HENNESSEY, | B304904 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 19STRO08172) |
| v. | |
| JACOB RASMUSSEN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Joshua D. Wayser, Judge.  Affirmed.

Jacob Rasmussen, in pro. per., for Defendant and Appellant.

Shebby • Hirashima, David P. Shebby and Kristen Hirashima for Plaintiff and Respondent.

_____

Maureen Hennessey obtained a five-year protective order under the Domestic Violence Prevention Act (DVPA) (Fam. Code,[1] § 6200 et seq.) against Jacob Rasmussen because he stalked her and became threatening after she repeatedly told him that she did not want to continue their brief dating relationship. Rasmussen appeals from the issuance of the protective order. We affirm.

## BACKGROUND

Viewing the record according to the applicable rules of appellate review (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143),[2] the following facts emerge: Hennessey and Rasmussen work in different departments at the University of California, Los Angeles (UCLA). Rasmussen lives in Westwood; Hennessey lives in central Santa Monica. The two dated in January and February 2019. They were sexually intimate in February 2019. Hennessey then realized she was not romantically interested in Rasmussen.

In mid-February, Hennessey went hiking with Rasmussen so she could tell him she was not interested in dating him. Rasmussen appeared not to comprehend her and made advances

---

[1] All further statutory references are to the Family Code unless otherwise indicated.

[2] Rasmussen's briefs improperly cite to many facts that are not part of the record on appeal. (Cal. Rules of Court, rule 8.204(a)(1)(C) [appellant's briefs must support any statement of fact with citation to the record]; *id.*, rule 8.204(a)(2)(C) [appellant's briefs must limit statements "to matters in the record" on appeal].) We cannot consider such facts and therefore decline to mention or address them. (*Dhawan v. Biring* (2015) 241 Cal.App.4th 963, 967, fn. 7.)

by holding her hand, and hugging and squeezing her. Feeling very uncomfortable, Hennessey tried to keep her distance. She agreed to have lunch with Rasmussen twice in late February 2019 to reiterate that she did not want to date him.

In May 2019, as Hennessey was walking to her parking lot after work, Rasmussen ran up behind her. As he walked her to her car, he interrogated her about why she would not date him. His questions came faster and faster, and "appeared to be getting more frantic." Hennessey made it clear she had no romantic interest in him and would not date him. Upon arrival at the car, Rasmussen stood "very close" to Hennessey and to her car, repeating his questions. She felt uncomfortable. He continued to question her. She told him to calm down and that she was leaving.

In April and May 2019, Hennessey encountered Rasmussen in the hallway to her office. Rasmussen had a new job in which he periodically conducted meetings in the room next door. On several occasions, Rasmussen tried to stop Hennessey as she walked to the restroom, but she refused to engage with him. One morning, Rasmussen and two others were walking toward Hennessey as she returned to her office. Rasmussen veered in her direction forcing her to hop to the side, turn sideways, and hit the wall to avoid colliding with him. Later, she encountered him again chatting with several people. He blocked her access to her office and in a loud voice said, "we should probably get lunch soon." Embarrassed, and to get him to stop and move out of her way, she responded, "yeah maybe," and darted into her office.

The following day, Hennessey told Rasmussen that he had been unprofessional and had embarrassed her. Rasmussen insisted his behavior was justified because she had "ghosted"

him.  He repeatedly asserted that she could not treat him disrespectfully and that she owed him more.  She begged him to leave her alone.  He stood up, looked down at her, and yelled, "bipolar, anorexic, bitch!"  Hennessey came to dread Mondays and to avoid using the restroom for fear she would encounter Rasmussen loitering in the hallway.

Hennessey believed the two additional times she ran into Rasmussen between May and September 2019 were coincidences.  However, on September 25, 2019, at 6:15 p.m., she noticed Rasmussen jogging in front of her home and in front of her Pilates studio, which surprised her because he lived and worked seven miles away in Westwood.  She met with an attorney.

On October 8, 2019, Hennessey's ex-boyfriend Sammy Shon saw Rasmussen jogging up and down the street four times in front of Hennessey's Pilates studio.  Shon watched Rasmussen stop jogging and walk past Hennessey's apartment building.  Shon followed Rasmussen as he went to his car, and observed him as he drove back past the Pilates studio three more times.  The next day, Shon watched Rasmussen drive past the Pilates studio.  A week later, Shon saw Rasmussen walk by Hennessey's apartment building and stare into the lobby.

Hennessey hired a private investigation company whose employees followed Rasmussen, at approximately 5:00 p.m. on October 14, 15, and 28, 2019, as he drove 25 to 35 minutes from his Westwood home, along Sunset Boulevard, to Hennessey's Santa Monica neighborhood.  Each time, the employees photographed as Rasmussen jogged around Hennessey's neighborhood and slowed to a walk in front of her Pilates class, and then drove 35 to 40 minutes back home.  Out of fear for her safety, Hennessey began carrying pepper spray.

4

On November 19, 2019, Hennessey's attorney served Rasmussen with a cease-and-desist letter. Around midnight that night, Rasmussen sent an email to his boss, with copies to Hennessey and her boss, in which he emphasized he'd had a "private encounter" with Hennessey.

On November 26, 2019, Hennessey applied for a domestic violence restraining order against Rasmussen because her dating relationship with him had become threatening. Manny Tau, a clinical and forensic psychologist and "Certified Threat Manager," declared in connection with Hennessey's application that Rasmussen posed a "high threat potential for harassing, threatening[,] and unwanted-pursuit/stalking behaviors" towards Hennessey.

The trial court issued a temporary order that same day, restraining Rasmussen from coming within 100 yards of Hennessey's home, workplace, car, and the Pilates studio where Hennessey exercises. Rasmussen filed his own request for a restraining order two weeks later.

In December 2019, while the temporary restraining order protecting Hennessey was in effect, Shon saw Rasmussen within 100 yards of the building in which Hennessey works and again within 100 yards of her Pilates studio.

At the close of the trial on Hennessey's request for a permanent restraining order, the trial court stated, "[W]hat you're saying to me is, no, it wasn't stalking. It was just engaging in his usual pattern of behavior, and that's really the heart of the matter, and it's just a credibility call. I think that's largely it. Am I missing something?" Rasmussen's counsel replied, "No, Your Honor." Declaring the "credibility call" to be "an easy one," the court believed Hennessey and disbelieved

Rasmussen's story that he was simply exercising in Hennessey's neighborhood, finding that Rasmussen's case "just doesn't add up." The court also found that the testimony of a UCLA police officer, not included in the record on appeal, "set[ ] off lethality factor worries." Finding Rasmussen to be stalking Hennessey, the trial court issued a permanent order restraining him from contacting, harassing, stalking, disturbing the peace of, or surveilling Hennessey, and ordering him to stay at least 100 yards from her home, work, vehicle, and Pilates studio for five years. Rasmussen timely appealed.

## DISCUSSION

I. Rasmussen fails to demonstrate error.

### A. *Inadequate record and improper briefing*

Rasmussen did not designate a complete record. He omitted his own testimony, that of Hennessey, and that of the UCLA Police Officer; and he included only part of the reporter's transcript of the statement of decision. Rasmussen's failure to carry his burden to provide an adequate record on a particular issue " 'requires that the issue be resolved against' " him. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Rasmussen moved to augment the record with numerous documents that were not before the trial court. (See Cal. Rules of Court, rule 8.122(a)(1), (b)(3)(A).) Augmentation cannot be used to supplement the record with materials not before the trial court. (*Vons*

*Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)[3]

### B. *Invited error and forfeiture*

The DVPA defines domestic violence as "abuse perpetrated against," among others, a "person with whom the respondent is having or has had a dating or engagement relationship." (§ 6211, subd. (c).) The DVPA defines abuse to include placing "a person in reasonable apprehension of imminent serious bodily injury to that person or to another," and stalking. (§§ 6203, subd. (a)(3) & 6320, subd. (a).)

Rasmussen contends that the trial court erred in finding that he was in a dating relationship with Hennessey. But in his own application for a domestic violence restraining order, Rasmussen checked off the box characterizing their relationship as follows: "*We are dating or used to date*, or we are or used to be engaged to be married." (Italics added.) Having claimed in the trial court that he was in a dating relationship with Hennessey, Rasmussen cannot be heard to argue to the contrary on appeal. (Cf. *Tri-Counties Assn. for the Developmentally Disabled, Inc. v.*

---

[3] We grant Rasmussen's January 6, 2021 motion to augment the record with the exhibits from volumes two through four of the motion, but as noted, we deny the motion to augment with the exhibits from volumes five and six because there is no indication these exhibits were filed or lodged with the trial court. (*Vons Companies, Inc. v. Seabest Foods, Inc.*, *supra*, 14 Cal.4th at p. 444, fn. 3.) Rasmussen's second request for judicial notice filed on May 3, 2021, is denied in its entirety. (*Ibid.* [appellate courts do not take judicial notice of evidence not presented to trial court].) Hennessey's motion dated April 13, 2021, to take judicial notice of exhibits one through three is granted, but is denied as to exhibit four. (Evid. Code, § 452, subd. (d).)

*Ventura County Public Guardian* (2021) 63 Cal.App.5th 1129, 1140–1141 [party estopped under invited error doctrine from challenging trial court's finding made based on party's assertion].)

Rasmussen next argues that the trial court erred in admitting the testimony of Hennessey's private investigators because they were not licensed. At no time during trial, however, did Rasmussen object to the investigators' testimony. Rather, Rasmussen's attorney cross-examined each of those witnesses and elicited that the private investigators, who were not licensed, worked under a licensed investigator. Rasmussen's counsel did not then move to strike the witnesses' testimony. Rasmussen may not therefore claim now that the admission of the evidence was error (*People v. Abel* (2012) 53 Cal.4th 891, 924), and has forfeited the argument on appeal (*People v. Dowl* (2013) 57 Cal.4th 1079, 1082).

C.    *We may not reassess the trial court's credibility findings.*

Many of Rasmussen's contentions on appeal challenge the trial court's evaluation of the evidence and of the witnesses' credibility. Although the grant or denial of a protective order under the DVPA falls within the trial court's discretion (*Burquet v. Brumbaugh, supra,* 223 Cal.App.4th at p. 1143), we review the court's factual findings for sufficiency of the evidence (*ibid.*). Under that standard, we do not "weigh conflicts and disputes in the evidence; that is the province of the trier of fact." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) Our review " ' " '*begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]"

[Citation.] . . . [Citation.]' [Citation.] The test 'is simply whether there is substantial evidence in favor of the [prevailing party]. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing.' " (*People v. Overstock.com, Inc*. (2017) 12 Cal.App.5th 1064, 1079.)

Rasmussen appears to argue that Hennessey produced no evidence that he stalked her, whereas he had an innocent reason for his increasingly frequent presence in Hennessey's neighborhood in the evenings, namely exercise. We cannot consider the myriad allegations in Rasmussen's briefs, which are designed to support his defense below but which are unsupported by the record. Rather, the inadequate record Rasmussen has provided on appeal means we must resolve this issue against him.

The evidence that the record does contain, moreover, amply supports the trial court's finding that Rasmussen stalked Hennessey and disturbed her peace of mind. She declared that Rasmussen became aggressive and angry at her, and scared her when she reiterated that she did not want to see him. Rasmussen then became vicious and insulting and sought to embarrass her. Numerous witnesses described how Rasmussen frequently and repeatedly drove approximately 35 minutes from his home, in 5:00 p.m. traffic, to jog in a radius around Hennessey's neighborhood, and how he slowed to a walk in front of her home and her Pilates studio. Shon related how Rasmussen violated the temporary restraining order in December 2019. In issuing the permanent restraining order, the trial court credited

evidence introduced by Hennessey, and disbelieved Rasmussen's explanation for his conduct. As Rasmussen's attorney acknowledged to the court, at its core, the case called for a credibility assessment. We can neither reassess the trial court's credibility finding nor reweigh the evidence.

Rasmussen contends that the trial court improperly used "folklore, anecdote and invented facts[,] rather than law and evidence" in issuing the protective order, which violated his "constitutional right to Freedom of Movement." Rasmussen cites to the portion of the reporter's transcript in which the court explained, based on personal experience, that Rasmussen's explanation for being in Hennessey's neighborhood—namely that he traveled out of his way in some of the worst traffic in Los Angeles simply to exercise—was nonsensical. The portions of the record Rasmussen cites demonstrate that the court did exactly as it is required to do: it used its common sense and experience—not folklore and invented facts—when deciding whether to believe Rasmussen's explanation for his behavior. (See *In re H.M.* (2008) 167 Cal.App.4th 136, 144 [courts view evidence objectively and "through the lens of common sense and experience" in determining factual questions].)

The contentions in the section of Rasmussen's brief entitled the "STALKING VERDICT ISSUE" are unclear. It appears Rasmussen is arguing that the trial court engaged in favoritism because it based its finding on speculation about the "amount of money" Hennessey spent to obtain the protective order, and about whether she is mentally ill. Rasmussen recites the court's statement that "Ms. Hennessey is either lulu, or she's just been through the ringer about times ten, and she just spent a lot of time and money to protect herself, and I understand why she did.

10

She was exactly right to." The quoted statement is simply another explanation for why the court believed Hennessey's view of the events over Rasmussen's. When the trial court's assessment of credibility and the evidence is based upon actual observation of the witnesses and the evidence introduced during trial, that assessment does not amount to improper bias or and prejudice merely because it appears to be adverse to the appellant. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1219.) That Rasmussen disagrees with the court's conclusion does not make the order reversible.

Finally, Rasmussen contends that the trial court mischaracterized exhibit 12, the midnight email entitled "Harassment claim against Maureen Hennessey" that Rasmussen sent to his employer, Hennessey, and her boss, several hours after he was served with Hennessey's cease-and-desist letter. In the email, Rasmussen wrote in very large font that he was involved in "a private encounter" with Hennessey. The court rejected Rasmussen's attorney's argument that Rasmussen sent that email to be a "responsible professional," stating, "one does not send an e-mail at twelve o'clock at night to one's employer unless you want to communicate you're under stress and then copying her boss . . . referring to an intimate relationship, using all caps, I believe." Although Rasmussen's email did not use the words "intimate relationship," and did not use all capital letters, the court clearly disbelieved the letter was sent in a responsible and professional manner because of the hour at which it was sent, the very large font size, the recipients, and the gratuitous reference to a private encounter.

More important, however, even assuming the trial court improperly mischaracterized the capitalization and the phrase

11

"private encounter"—which, on the record presented, we do not conclude that it did—Rasmussen makes no effort to demonstrate prejudice.  (Cal. Const., art. VI, § 13.)  "Reversal is justified 'only when the [appellate] court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1098–1099.)  Given the ample evidence supporting the restraining order, any mischaracterization of the capitalization and of the phrase "private encounter" in Rasmussen's email is of no moment.  It is simply not reasonably probable Rasmussen would obtain a different result absent the mischaracterization.  On the contrary, the court's lengthy explanation for its ruling—in the part of the transcript Rasmussen did include in the record on appeal—shows that the trial court acted well within its discretion in issuing the protective order.

## DISPOSITION

The order is affirmed. Maureen Hennessey is awarded her costs on appeal.

NOT TO BE PUBLISHED.


THOMAS, J.\*

We concur:


EDMON, P. J.


LAVIN, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13