Filed 1/13/23 P. v. Reynolds CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RODERICK JAMES REYNOLDS,<br><br>    Defendant and Appellant. | H047947<br>(Santa Clara County<br>Super. Ct. No. C1913097) |

Following the denial of his motion to suppress evidence, Roderick James Reynolds pleaded no contest to one misdemeanor count of resisting an officer (Pen. Code, § 148, subd. (a)(1))[1] and one felony count of accessory after the fact of a felony (§ 32). He also admitted having a prior strike conviction (§ 1170.12). The trial court granted Reynolds's motion to dismiss the prior strike, suspended imposition of sentence, and granted him three years of probation.

Reynolds now appeals. He argues that the order denying his motion to suppress evidence should be reversed. The Attorney General disagrees. Reynolds also argues that the probationary term must be reduced to two years. The Attorney General responds that the matter is now moot because probation has been terminated. In his reply brief, Reynolds agrees.

---

[1] Unspecified statutory references are to the Penal Code.

We conclude that the motion to suppress evidence should have been granted, and we agree with the parties that the probation issue is now moot. Thus, we will reverse and remand for further proceedings.

## I. Factual Background

### A. Suppression Hearing

On June 6, 2019, at approximately 6:35 p.m., San Jose Police Officer Frank Orabuena was on patrol when he observed a vehicle that "was weaving in and out of traffic going a little faster than all the other vehicles on the road." He observed the vehicle make a right-hand turn, cutting off a truck and almost causing an accident. Orabuena followed the vehicle, activated his lights and siren, and proceeded to stop the vehicle for a Vehicle Code infraction. Orabuena's interactions with the vehicle's occupants were captured by his body worn camera and played at the suppression hearing.[2]

### 1. Body Worn Camera Video

The video shows Orabuena approach the vehicle, finding three occupants—a driver, a front-seat passenger (Reynolds), and a backseat passenger sitting behind Reynolds. Orabuena asked the driver why he was driving erratically. Reynolds responded that he "needed to pee." Orabuena asked the driver for his driver's license and asked Reynolds and the backseat passenger if they had any identification as well. The driver, later identified as Robert King, indicated he did have a driver's license, reached for it, and handed it to Orabuena. In response to Orabuena's question regarding identification, Reynolds told Orabuena, "Negative. I just went down to the VA to get a new one." The backseat passenger also indicated she had no identification.

Orabuena then walked around the back of the vehicle to the other side of the vehicle to speak with Reynolds through the open front-seat passenger window. As he

---

[2] The video footage was admitted as a defense exhibit along with a transcript of the interactions it depicts.

walked, he requested over his radio that another unit conduct a "roll by" at the traffic stop. Reynolds, who was smoking a cigarette, proceeded to tell Orabuena his name and date of birth. The backseat passenger gave her name as Selena Borras and provided a date of birth. Orabuena then stepped away from the car, stood on the sidewalk, and gave the names and birth dates to the dispatcher over the radio.

During the records check, but before Selena's information had been transmitted, Orabuena yelled, "Stop fucking moving around." Selena responded with a comment that was inaudible on the body camera video. Orabuena responded, "I just saw you hand him that shit." Selena responded, again with a largely inaudible comment, except for the word "cigarette." As she replied, Reynolds held up a lighter with his right hand and said something to Orabuena, which is largely inaudible except for the word "lighter." Orabuena proceeded to convey Selena's name and date of birth to the dispatcher over the radio. About two and a half minutes later, Orabuena asked the dispatcher if there was a female officer available.

Less than a minute later, another officer arrived on the scene. Orabuena then asked the dispatcher, "Can you run on King's probation? And then also, [are] there any descriptors for Roderick?" Orabuena then said, "I said stop moving around Selena. You." Selena responded, "I'm not moving around," and then she made additional inaudible comments. At this point, a third officer had arrived on the scene and was now visible on the video. Orabuena turned to the third officer, and told him, "When I was there, I don't know if he hand[ed] something back or if she hand[ed] something forward. [The] passengers, they were handing something off. And then she keeps going like this."

The third officer asked Orabuena, "Do you want to get them out of the car?" Orabuena responded, "Yeah, now that you guys are here."

After a few moments, Orabuena walked to Selena's backseat door, opened it, and directed her to exit the vehicle. Selena faced the car and Orabuena proceeded to conduct

3

a pat search while asking her if she was armed. Finding nothing, Orabuena directed Selena to sit down on the curb.

At the same time, the third officer instructed someone in the vehicle, "Hey bro, stay off your phone. C'mon man, you know the drill. Stay off your phone."

Orabuena then walked to the driver's door, opened it, and directed the driver to get out. As Orabuena conducted a pat search, he asked the driver, "You have no knives or anything like that?" After completing the search, Orabuena directed the driver to also sit on the curb.

Orabuena then walked to the front-seat passenger door, and directed Reynolds, "Alright Mr. King [*sic*], step out and face the car, right this way." As Reynolds got out of the car, Orabuena told Reynolds, "Hey, keep your hands where I can see them." Reynolds responded, "Just fixing my pants." Orabuena said, "I'll fix your pants." Reynolds turned around, facing the car with his back to Orabuena, who then proceeded to pat search him. Orabuena told Reynolds, "You can ask and then I'll explain it." After a few more moments and while still conducting the pat search, Orabuena asked, "What's this dude?" Reynolds responded, "What's what?" Orabuena asked again, "What is it?" Reynolds repeated, "What's what?" The second officer then interjected, "Just shoot straight with us and we'll have you out of here."

After that statement, Orabuena took out his handcuffs and proceeded to put them on Reynolds's wrists. Reynolds then said, "Oh shit," and after a few more moments said, "Hey, why am I being handcuffed?" At this point, someone said, "Hey dude," and then someone said, "Get the fuck off," as a struggle ensued. The body camera footage then ended abruptly when the camera became dislodged.

### 2. *Orabuena's Direct Testimony*

Orabuena testified that he pulled over King's vehicle for "weaving in and out of traffic" and nearly causing an accident. He made initial contact with the driver, King,

4

who provided identification. The two passengers said they did not have identification and so Orabuena took their names to conduct a records check.

Orabuena testified that at some point during the records check, the name provided by the backseat passenger, Selena Borras, came back as "[n]o match." Orabuena testified that this aroused his suspicion because "people [who] are untruthful about their name . . . usually [are] trying to conceal something" like "probation, parole, warrants, something like that."[3]

While he was running the records check, Orabuena saw "the rear passenger she was being very fidgety, reaching into her purse, into—underneath her arm area." He "also saw her pass something up to the front passenger." Asked if he could see what was being passed, Orabuena responded he "could not." Asked whether he could identify if it was a weapon, he responded, "I could not at all." However, he stated the fidgeting caused him to be concerned for his safety, because he was "unaware of what they were passing." Based on his training and experience, he stated he knew "people often conceal weapons, drugs. People often will attack a police officer in [an] attempt to flee from a situation where they may be arrested."

Orabuena testified that he directed the backseat passenger, Selena, to exit first because she was "the most fidgety" and "the most uncompliant." After next removing King, the driver, Orabuena stated he asked Reynolds to exit the vehicle. Orabuena testified that Reynolds "was very slow to comply to get out of the vehicle." Orabuena noticed that Reynolds put his hands "to his sides" and "near . . . his back," which made Orabuena suspicious, because he had earlier seen Selena pass something forward. Orabuena explained that people usually "carry most of their weapons" in "the[] waist

---

[3] Selena later correctly identified herself as Selena Trevino. At some point, Orabuena learned King was on probation with search conditions and Selena was on postrelease community supervision, but was unable to testify whether this information was received prior to the pat search of Reynolds.

area" of their body. Orabuena testified that it looked like Reynolds was "[a]ttempting to reach for a weapon," and so after Reynolds exited the vehicle he decided to conduct a pat search "[f]or my safety, my partner's safety, anybody else's safety that was around the area." Orabuena estimated that Reynolds was about 100 pounds heavier than him and two inches taller than him. He also recalled that Reynolds's shorts were "very bagg[y]" and "loose fitting," which meant that Reynolds could more easily conceal weapons.

Orabuena testified that while conducting the pat search, he started with the front waist band, where he felt "a bulge." When asked if he "could . . . feel what that object was," Orabuena responded, "I could not." When asked if he was able to rule out whether it was a weapon, Orabuena responded, "Not a hundred percent." Orabuena asked Reynolds what the object was, and Reynolds responded, "[s]omething to the effect of 'what is what,' " which concerned Orabuena because "a lot of times" individuals attempt "to stall or deflect" as they try to "come up with some sort of plan" on what to do next.

Orabuena decided to handcuff him. He testified that he did so based on Reynolds's response and his "observations . . . from the get-go." He elaborated that the vehicle occupants "were kind of being passively resistant" from the beginning, and that "the observations you make as a police officer, people's actions, people's body movements, people's body language and the things that they say or may not say just lead you—you want to protect yourself."

After Orabuena placed a handcuff on his left wrist, Reynolds "tensed up, pulled away," and "asked why he was being detained." Reynolds attempted to turn around. Orabuena pushed him against the vehicle "to gain control of him" but was unable to pull Reynolds's right arm behind. At this point, both Reynolds and Orabuena fell to the ground, and Orabuena then successfully handcuffed Reynolds. After the struggle, a white powder was found on the ground underneath Reynolds. The bulge in Reynolds's waistband was now gone. The powder tested presumptively positive for methamphetamine.

6

### 3. *Orabuena's Cross Examination*

On cross examination, Orabuena was asked whether "someone" directed Reynolds to place his hands behind his body "as soon as he gets out of the car," and Orabuena responded, "By me." Defense counsel clarified, "by a police officer?" Orabuena responded, "Yes."

Defense counsel also asked Orabuena about his testimony at the preliminary hearing regarding what concerns he had about officer safety. Orabuena acknowledged saying, " 'Just the whole fidgeting around in the vehicle[,] one of the . . . passenger[s] gave a name that came back with no match. Just the whole—it's really hard to explain this. The little hints and subtle movements and actions that you can see in a person when you know that they are attempting to conceal something and at that time I did not know what it was.' " Orabuena also acknowledged testifying at the preliminary hearing that it was Selena, the backseat passenger, who was "fidgeting around the most," and that he thought " 'that if there was a weapon, she would probably have it.' " After some back and forth, Orabuena affirmed that "the principal basis of believing that officer safety was at risk" was the "fidgeting in the car with respect to Mr. Reynolds."

Orabuena was then directed to watch a portion of the body worn camera video, when he observed what he believed to be Selena "hand[ing] something off" to Reynolds. Orabuena also observed Reynolds "hold[] something up and say[] it was just my lighter." Defense counsel played approximately three minutes and 15 seconds of video after the point when Orabuena again told Selena "to stop moving around." Orabuena acknowledged that during that time period, Selena and Reynolds were essentially just "smoking a cigarette." Orabuena affirmed that he never mentioned anything about a "fear of there being a weapon" to the backup officer who arrived shortly thereafter. He also affirmed that the sole reason for stopping the vehicle "was for failing to yield to oncoming traffic."

7

## II. Procedural Background

An information charged Reynolds with possession for sale of a controlled substance (count 1; Health & Saf. Code, § 11378), transportation, sale, distribution of a controlled substance (count 2; Health & Saf. Code, § 11379, subd. (a)), resisting an officer (count 3; § 148, subd. (a)(1)), and destroying or concealing evidence (count 4; § 135). The information also alleged Reynolds had a prior strike conviction (§ 1170.12).

Reynolds filed a motion to suppress evidence (§ 1538.5). Following two hearings and briefing, the trial court denied the motion. The court found that the prosecution had demonstrated "there was reasonable police conduct here at the time that the officer conducted the pat search of Mr. Reynolds." The court noted a number of factors supporting Orabuena's reasonable suspicion: "the officer's testimony about training and experience, the furtive movements that were observed . . . between the back passenger and the defendant throughout the course of the interaction," the suspicion that "something was being moved" between the "back passenger to Mr. Reynolds and/or vice versa, the marginal cooperation, the questionable honesty of the individuals who were being questioned about identity," and Reynolds's movement "toward his waistband just before he exited the vehicle." Since the pat search was supported by reasonable suspicion, the court also found the officer "justified in placing Mr. Reynolds in handcuffs" after he felt the bulge. Thus, the court concluded that the discovery of the contraband on the ground did not violate the Fourth Amendment.

Following the denial of the motion to suppress, pursuant to a plea agreement, Reynolds pleaded no contest to misdemeanor resisting an officer (§ 148, subd. (a)(1)) and a felony count of accessory after the fact (§ 32), and admitted one prior strike conviction (§ 1170.12). In exchange, Reynolds was promised a disposition of not more than 32 months in custody and the opportunity to move to dismiss the prior strike.

On January 24, 2020, the trial court granted Reynolds's motion to dismiss the prior strike conviction. The court suspended imposition of sentence and granted

8

Reynolds three years of probation, including 180 days in county jail with credit for 60 days.

Reynolds timely appealed.

### III. Discussion

#### A. *The Pat Search*

Reynolds argues that the pat search violated his Fourth Amendment rights because Orabuena acted without reasonable suspicion that he was armed. The Attorney General maintains that the totality of the circumstances justified the search. The Attorney General cites a number of factors: the occupants " 'fidgeting' and 'moving around' "; the " 'no match' " on the records search for Selena; the manner in which Reynolds exited the vehicle; Reynolds's "loose-fitting and baggy clothing"; and Reynolds weighing approximately 100 pounds more than Orabuena.

#### 1. *Standard of Review*

Absent a recognized exception, a warrantless search is per se unreasonable under the Fourth Amendment. (U.S. Const., 4th Amend.; *Katz v. United States* (1967) 389 U.S. 347, 357.) One such exception is the " 'frisk' " or pat search exception, in which officers conducting an investigation search a suspect for concealed weapons. (See *Terry v. Ohio* (1968) 392 U.S. 1, 10 (*Terry*).) In *Terry*, the United States Supreme Court held that, "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (*Id.* at p. 30.)

9

In determining the reasonableness of a pat search, courts look to the totality of the circumstances to determine whether the police officer conducting the search can "point to specific and articulable facts which, taken together with rational inferences from those facts" (*Terry*, *supra*, 392 U.S. at p. 17), demonstrate that the officer "has reason to believe that he is dealing with an armed and dangerous individual . . . ." (*Id*. at p. 27; *United States v. Cortez* (1981) 449 U.S. 411, 417.) While "[t]he officer need not be absolutely certain that the individual is armed" (*Terry*, *supra*, at p. 27), "[a]n inchoate and unparticularized suspicion or hunch is not sufficient, nor is the fact the officer acted in good faith." (*In re H.M.* (2008) 167 Cal.App.4th 136, 144 (*H.M.*).) "Where specific and articulable facts are absent, the [pat search] cannot be upheld." (*Ibid*.)

Our standard of review is well established. "In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings, express or implied, where supported by substantial evidence. [Citation.] And in determining whether, on the facts so found, the search was reasonable for purposes of the Fourth Amendment to the United States Constitution, we exercise our independent judgment." (*People v. Simon* (2016) 1 Cal.5th 98, 120.)

### 2. *Orabuena Lacked Specific and Articulable Facts That Reynolds Was Armed*

In this case, the trial court's express factual findings were not supported by substantial evidence. Rather, the facts adduced at the suppression hearing, including the body camera video evidence and testimony, failed to show specific and articulable facts supporting a reasonable inference that Reynolds was armed.

In finding grounds for reasonable suspicion, the trial court cited the "furtive movements" between the vehicle occupants and the suspicion that "something" was being moved. On appeal, the Attorney General also points to Orabuena's observation that the occupants of the vehicle continued to " 'fidget' " and " 'mov[e] around' " throughout the traffic stop, and that there was an apparent handoff between Selena and Reynolds.

10

"Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." (*H.M.*, *supra*, 167 Cal.App.4th at p. 144.) However, as our high court has explained, nervousness, alone, does not provide a sufficient basis for a frisk. A defendant's nervousness "could understandably result from extended police questioning because of a 'traffic violation.' [¶] . . . Many individuals who are accosted and queried by a police officer become both upset and desirous of the earliest possible termination of an uncomfortable situation." (*People v. Lawler* (1973) 9 Cal.3d 156, 162, fn. omitted (*Lawler*), partially superseded by statute on another ground as stated in *People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223.)

Orabuena's testimony and the body camera video do not support a finding of reasonable suspicion based on the passenger's behavior or movements. First, nothing in the body camera footage is indicative of nervous or fidgety behavior by Reynolds. After viewing the video on cross examination, Orabuena admitted that after he first told Selena to stop moving around, Reynolds and Trevino were "essentially" just smoking cigarettes for about three minutes and 15 seconds. Our review of the video evidence confirms that the vehicle occupants' behavior appeared to be largely innocuous, especially in the context of a traffic stop. "[M]inor traffic offenses do not reasonably suggest the presence of weapons, [and thus] an officer may not search the [vehicle occupant] or those areas of a car where a weapon may be hidden or accessible unless the objective circumstances furnish reasonable grounds to believe the [vehicle occupant] is armed and/or dangerous and may gain immediate control of a weapon." (*People v. Miranda* (1993) 17 Cal.App.4th 917, 927 (*Miranda*).)

As for furtive movements or the alleged handoff between Selena and Reynolds, Orabuena affirmed at the suppression hearing that he "could not at all" say whether it was a weapon that was exchanged. There is no indication in the body camera video, from his movements or words, that Orabuena had observed what he believed to be a weapon handoff. He did not, for instance, alert the backup officers or dispatch that he suspected

11

the vehicle occupants were armed. Nor, as explained below, were the occupants observed engaging in activity that reasonably suggested the possibility they were armed.

In *People v. Dickey* (1994) 21 Cal.App.4th 952 (*Dickey*), the officer encountered the defendant and a passenger sitting inside a stationary vehicle in the middle of a one-lane dirt road with the engine running. (*Id.* at p. 954.) The officer observed the defendant making " 'furtive' " movements in the driver's seat. (*Ibid.*) The defendant provided his name but was unable to produce written identification. (*Ibid.*) The defendant explained that he was "just admiring the view" and twice refused consent to search the vehicle. (*Ibid.*) The officer ordered the defendant and passenger from the car, and with the defendant's permission searched a backpack in the car. (*Id.* at p. 955.) He found a film cannister containing baking soda, which he knew was a cutting agent for narcotics. (*Ibid.*) The officer also noticed that the defendant was "nervous and sweating despite the fact that it was a cool day." (*Ibid.*) At that point, the officer decided to pat search the defendant because, based on the factors he had already observed, and the fact that the defendant appeared nervous, he concluded the defendant " 'potentially may have been armed.' " (*Ibid.*) The Court of Appeal held that the pat search could not be justified based on the defendant's furtive movements, his lack of identification, his refusal to a consensual search, that he was nervous and sweating, or because baking power was found. (*Dickey*, *supra*, 21 Cal.App.4th at p. 956.) Although the officer testified that he performed the pat search for " 'officer safety' " and because the defendant " 'potentially may have been armed,' " the court concluded these conclusions "add[ed] nothing" without specific and articulable facts that the suspect may be armed. (*Ibid.*) Indeed, the court observed, "[i]n every encounter with a citizen by the police, the citizen may potentially be armed." (*Ibid.*)

Here, as in *Dickey*, there were no specific and articulable facts, when taken alone or in combination, that suggested Reynolds was armed. Orabuena testified that he observed Selena, the backseat passenger, being "very fidgety" while seated in the car.

12

Minor traffic offenses, however, do not readily suggest the presence of weapons. (*Miranda*, *supra*, 17 Cal.App.4th at p. 927.) In that context, fidgety behavior, in the absence of any other indication that a more serious offense had been or was being committed, "could understandably result" from any number of other factors, none of which are reasonably indicative of weapons. (See *Lawler*, *supra*, 9 Cal.3d at p. 162.) Moreover, even crediting the observation that the vehicle occupants "mov[ed] around" and were "fidgety," Orabuena testified that this behavior was almost entirely confined to Selena, not Reynolds. In other words, insofar as Orabuena had a particularized suspicion based on "fidgety" behavior, that suspicion was not reasonably directed at Reynolds.

Factors supporting reasonable suspicion for a pat search must be based on something more than an "unparticularized suspicion or hunch," as was the case here. (*H.M.*, *supra*, 167 Cal.App.4th at p. 144.) For example, in *Terry* an officer with experience in theft cases observed Terry and two other men walking up and down a street, repeatedly looking into store windows but not going in. (*Terry*, *supra*, 392 U.S. at pp. 6-7.) The officer hypothesized that the men were "contemplating a daylight robbery," which would "likely . . . involve the use of weapons" given the time of day. (*Id*. at p. 28.) The officer conducted a pat search and found several revolvers. (*Ibid*.) The United States Supreme Court held that the pat down search was justified for officer safety because the officer had observed conduct indicative of a crime likely to involve a weapon. (*Id*. at p. 30.)

In *Pennsylvania v. Mimms* (1977) 434 U.S. 106, the United States Supreme Court applied *Terry* to find that a pat search was proper following a traffic stop for an expired license plate. (*Id*. at pp. 106-107.) In *Mimms*, after the defendant stepped out of the vehicle at the officer's request, the officer noticed a "large bulge" under the defendant's jacket around his waistband. (*Id*. at p. 107.) The United States Supreme Court found: "[T]here is little question the officer was justified. The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger

13

to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.' " (*Id.* at p. 112.)

Here, unlike in *Terry*, there were no specific articulable facts suggesting that Reynolds or the other vehicle occupants were involved in a crime likely to involve weapons. Prior to the discovery of the methamphetamine, there was no objective indication that anyone in the vehicle or Reynolds was transporting or selling drugs. The sole reason for the traffic stop "was for failing to yield to oncoming traffic." Further, in contrast to *Mimms*, Orabuena did not testify to observing a bulge or other indicia of a weapon on Reynolds's person prior to the pat search. Given that there was no suggestion that Reynolds or any of the other vehicle occupants were engaged in or had been engaged in a crime associated with weapons, Orabuena's speculation about the mere possibility that weapons were present and being passed around was not reasonable under the circumstances. (*Dickey*, *supra*, 21 Cal.App.4th at p. 956.)

The trial court also relied on the "marginal cooperation" and "questionable honesty of the individuals who were being questioned about [their] identity" in finding reasonable suspicion. On appeal, the Attorney General asserts that a heightened suspicion was justified because Orabuena received a "no match" from the records check for Selena. First, as to the trial court's finding about the cooperation and honesty of the individuals being questioned, the body camera video reflects that the occupants were largely cooperative with police. The driver, King, provided proper identification. Reynolds patiently and carefully provided his true name and date of birth. Selena, while outwardly cooperative, initially provided a false last name that resulted in a "no match" on the records check. To the extent that this meant anything, in the context of a traffic stop, it meant Selena might be trying to hide her identity for some reason. Giving a false name, by itself, does not create a reasonable inference that the person giving the false name is armed and thereby dangerous, nor does it reasonably suggest that *another* occupant in the same vehicle is also armed. At best, it gives an officer reasonable

14

suspicion that the individual may have committed the misdemeanor offense of falsely representing himself or herself to a peace officer (§ 148.9), which is not inherently a violent crime.

In support of the pat search, the Attorney General also points to Reynolds's exit from the vehicle as a factor giving rise to reasonable suspicion that he was armed. The Attorney General asserts that "[w]hen Officer Orabuena asked [Reynolds] to exit the vehicle he complied slowly and held his hands close to his sides as if he was 'attempting to reach for a weapon.' " In its ruling on the motion to suppress, the trial court found that Reynolds's movement "toward his waistband just before he exited the vehicle" contributed to reasonable suspicion supporting the pat search.

The trial court's finding and the Attorney General's argument, however, are not supported by substantial evidence. Orabuena testified on direct examination that he observed Reynolds place his hands near his waistband as he exited the vehicle, which led him to believe Reynolds may be reaching toward a weapon. Orabuena significantly undermined this claim, however, on cross examination when he admitted he physically directed Reynolds's hands behind Reynolds's body as soon as Reynolds got out of the vehicle. The body camera video, while somewhat inconclusive because Reynolds's hands cannot be seen for parts of the exchange, reflects Reynolds complied more or less expeditiously with Orabuena's instruction to exit the vehicle. As Reynolds is getting up from his seat, he is clearly holding a lighter in one hand. After standing completely, Orabuena requested that Reynolds keep his hands "where I can see them," with Reynolds responding, "Just fixing my pants." In response, Orabuena simply said, "I'll fix your pants." Reynolds then turned around and the pat search proceeded. Thus, we do not find substantial evidence that Reynolds's conduct in leaving the vehicle supported a reasonable suspicion that he was armed.

Finally, although not relied on specifically by the trial court, the Attorney General points to Reynolds's relative size, that he outweighed Orabuena by an estimated 100

15

pounds, and to Reynolds's "loose-fitting and baggy clothing" as further justifying the pat search.

Initially, we do not find substantial evidence supports the Attorney General's characterization of Reynolds's clothing as "baggy," or that it was "loose-fitting" in a way that suggested the possibility of a hidden weapon. The body camera footage clearly reflects that Reynolds was wearing a tight-fitting t-shirt, which left little room for a concealed weapon. While it may be relevant to consider, in assessing the reasonableness of a pat search, whether an officer observed "visible bulges" or "baggy clothing" (*In re Jeremiah S.* (2019) 41 Cal.App.5th 299, 305), neither factor was present in this case.

Even assuming that Reynolds's clothing could be fairly characterized as "baggy," to support reasonable suspicion this observation must be "coupled with *other* suspicious circumstances," which in combination with the clothing, "furnishes the requisite facts to support a patdown for weapons so that the search of the car [can] be safely performed." (*People v. Collier* (2008) 166 Cal.App.4th 1374, 1377, fn. 1, italics added.) In *Collier*, the court concluded that the defendant's baggy clothing was relevant to the reasonable suspicion inquiry: "When [the defendant] alighted from the vehicle, the officer was [reasonably] concerned about his safety based on [the defendant's] size, the baggy clothing, and the knowledge that [the defendant] or the driver may have been smoking marijuana." (*Id.* at p. 1378.) Key to the *Collier* court's reasoning was the suspicion that the defendant had been smoking or transporting drugs. (See *ibid.* [" 'guns often accompany drugs' "].) Here, in contrast to *Collier*, Orabuena's testimony failed to articulate any crime that he reasonably suspected Reynolds as having committed, or any other facts that reasonably led him to believe Reynolds was armed and dangerous. Assuming it was supported by substantial evidence, the factor of Reynolds's clothes or relative size, without more, was insufficient as a basis for reasonable suspicion that he was armed.

In sum, Orabuena's explanation of the facts that led him to believe the vehicle occupants generally, or Reynolds specifically, were armed and dangerous was neither specific nor articulable. His own explanation, from the preliminary hearing and affirmed by him at the suppression hearing, underlines this point: " 'Just the whole—it's really hard to explain this. The little hints and subtle movements and actions that you can see in a person when you know that they are attempting to conceal *something* and *at that time I did not know what it was*.' " (Italics added.) A pat search is justified *only* where the police officer conducting the search can "point to specific and articulable facts which, taken together with rational inferences from those facts" (*Terry*, *supra*, 392 U.S. at p. 21) demonstrate that the officer "has reason to believe that he is dealing with an armed and dangerous individual . . . ." (*Id.* at p. 27.) Lacking such specific and articulable facts, we conclude that the pat search in this case was unlawful.

### B. *Abandonment*

Because there were no specific, articulable facts supporting a reasonable suspicion that Reynolds was armed and dangerous before Orabuena conducted the pat search, the search was unlawful. However, the Attorney General contends that no reasonable expectation of privacy was violated because Reynolds abandoned the drugs during the struggle prior to his arrest. We disagree.

### 1. *Standard of Review*

"[N]o one has a reasonable expectation of privacy in property that has been abandoned." (*People v. Daggs* (2005) 133 Cal.App.4th 361, 365.) A person's reasonable expectation of privacy in an object or place is lost if he abandons the property at issue by intentionally relinquishing his interest in it. (*People v. Parson* (2008) 44 Cal.4th 332, 346.) This includes a defendant who discards contraband "while he [i]s running" from police. (*California v. Hodari D.* (1991) 499 U.S. 621, 629; see also *People v. Brown* (1990) 216 Cal.App.3d 1442, 1451 ["defendant's act of dropping the bag before making a

17

last ditch effort to evade the police supports the trial court's finding that defendant indeed abandoned the paper bag and lost any reasonable expectation of privacy in its contents"].)

"To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched." (*United States v. Pitts* (7th Cir. 2003) 322 F.3d 449, 456; see also *People v. Marquez* (2019) 31 Cal.App.5th 402, 409 ["The prosecution must prove by a preponderance of the evidence that the search falls within an exception to the Fourth Amendment warrant requirement."].) The question whether property is abandoned is an issue of fact, and the court's finding must be upheld if supported by substantial evidence. (*People v. Ayala* (2000) 24 Cal.4th 243, 279.)

### 2. *Reynolds Did Not Abandon the Methamphetamine*

In the trial court, the prosecution argued in opposition to the motion to suppress that Reynolds lacked standing to challenge the discovery of the methamphetamine because he abandoned it during the struggle with Orabuena. Reynolds did not challenge the prosecution's evidence or argument in the trial court, nor did the trial court explicitly rule on the abandonment claim. Thus, because the factual bases for this issue are fully set forth in the record and are not otherwise disputed, we may resolve this issue on appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 449 (*Boyer*); *Green v. Superior Court* (1985) 40 Cal.3d 126, 138 (*Green*).)

Here, a finding of abandonment is not supported by substantial evidence. There is no evidence Reynolds deliberately dropped the methamphetamine. Orabuena testified that after he felt a bulge during the pat search, he asked Reynolds about it twice. Reynolds declined to identify it, twice responding, "What is what?" Orabuena then moved to handcuff Reynolds, leading to a struggle in which both Reynolds and Orabuena fell to the ground. A white powder later determined to be methamphetamine "was spilled on the sidewalk" and the bulge was gone. Nothing in Reynolds's words or actions

reflected an intent to relinquish property interests in the item. Rather, they reflected a desire to keep the bag concealed in his clothing and close to his body throughout the traffic stop. Thus, abandonment is not supported by substantial evidence, and is not an independent basis on which to find the search and seizure lawful.

### C. *Attenuation*

Having concluded that the search and seizure was unlawful, we must determine whether the evidence obtained against Reynolds is subject to suppression under the " 'fruit of the poisonous tree' " doctrine. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 488.) In particular, the Attorney General contends that the discovery of the methamphetamine was attenuated by Reynolds's act of resisting arrest. As with the abandonment claim, attenuation was not explicitly litigated in the trial court. However, because the facts supporting the claim are fully set forth in the record, we may nonetheless address it on appeal. (*Boyer*, *supra*, 38 Cal.4th at p. 449; *Green*, *supra*, 40 Cal.3d at p. 138.)

### 1. *Standard of Review*

The exclusionary rule extends to the "fruits" of an illegal search or seizure, but not " ' "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " ' " (*People v. Brendlin* (2008) 45 Cal.4th 262, 268 (*Brendlin*).) " '[E]xclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence.' " (*Ibid.*) "Exclusion is *not* required where the connection to the original illegality has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint." (*People v. Durant* (2012) 205 Cal.App.4th 57, 65 (*Durant*).)

19

In *Brendlin*, police officers made an unlawful traffic stop of a car and, upon discovering that a passenger had an outstanding arrest warrant, conducted a search incident to arrest and found controlled substances. (*Brendlin*, *supra*, 45 Cal.4th at pp. 265-266.) The California Supreme Court held that the discovery of the arrest warrant constituted an intervening circumstance that attenuated the taint of the unlawful traffic stop. (*Id*. at p. 271.)

In evaluating whether an intervening event breaks the causal chain between an unlawful pat search and subsequent search, courts consider three factors articulated in *Brown v. Illinois* (1975) 422 U.S. 590: (1) the time lapse between the unlawful pat search and the discovery of the challenged evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. (*Brendlin*, *supra*, 45 Cal.4th at p. 269.) The prosecution bears the burden of demonstrating a legal justification, including attenuation, for an officer's warrantless search. (*People v. Redd* (2010) 48 Cal.4th 691, 719; *Boyer*, *supra*, 38 Cal.4th at p. 449.)

With respect to the first *Brown* factor, the "typical scenario" is a short or minimal lapse of time between an unlawful arrest or detention and the discovery of challenged evidence. (*Utah v. Strieff* (2016) 579 U.S. 232, 239 (*Strieff*).) Courts have generally "declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." (*Ibid*.) Temporal proximity is "most relevant when the alleged attenuating factor was a volitional act by the defendant, such as resisting arrest or flight, because in such cases a brief lapse of time makes it more likely the search was the product of the detention itself." (*Durant*, *supra*, 205 Cal.App.4th at p. 65.)

As for the second *Brown* factor, the presence of intervening circumstances, "[t]he attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." (*Strieff*, *supra*, 579 U.S. at p. 238.) " 'That degree of "attenuation" which suffices to

20

remove the taint from evidence obtained directly as a result of unlawful police conduct requires at least an intervening independent act by the defendant or a third party which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained "by exploitation of that illegality." ' " (*People v. Superior Court of Marin County* (1975) 13 Cal.3d 406, 410.)

The third *Brown* factor, "the flagrancy and purposefulness of the police misconduct, is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' " (*Brendlin*, *supra*, 45 Cal.4th at p. 271.) "Where the seizure is flagrantly or knowingly unconstitutional or is otherwise undertaken as a fishing expedition, the third *Brown* factor will make it unlikely that the People would be able to demonstrate an attenuation of the taint of the initial unlawful seizure." (*Id*. at p. 272.) In applying these principles in *Brendlin*, the court found it significant that although there was insufficient evidence to justify the challenged detention, "the insufficiency was not so obvious as to make one question [the officer's] good faith in pursuing an investigation of what he believed to be a suspicious registration, nor does the record show that he had a design and purpose to effect the stop 'in the hope that something [else] might turn up.' " (*Id*. at p. 271.)

## 2. *The Discovery of the Methamphetamine Was Not Attenuated*

In this case, the first factor, temporal proximity, favors suppression. The Attorney General concedes as much. Reynolds's resistance to Orabuena's attempt to handcuff him began about 20 to 30 seconds after the unlawful pat search. Given that the challenged evidence was discovered moments after the unlawful pat search, the first *Brown* factor does not support a finding of attenuation.

The second factor, the nature of the intervening circumstances, also favors suppression. The Attorney General maintains that Reynolds's "attempt to flee the scene or to resist arrest" during the pat search was "an intervening circumstance that dissipates any taint from a putatively illegal detention." We disagree. Based on the video and

21

testimony, there is no evidence that Reynolds attempted to flee the scene. Prior to the pat search, Reynolds was otherwise compliant in answering Orabuena's questions and then in leaving the vehicle, and he responded affirmatively to Orabuena's verbal and physical instructions. Orabuena's initial attempt at detaining Reynolds happened during the pat search and was unannounced. Reynolds's resistance, which consisted of attempting to turn around and ask why he was being detained, was apparently directed at discovering the reason for his detention, not at inflicting harm or escaping custody. To the extent that Reynolds resisted Orabuena's attempt at detention, it was incidental to the pat search, rather than independent or intervening.

That Reynolds's conduct was not independent or intervening is confirmed by Orabuena's own testimony, in which he stated that he decided to handcuff Reynolds based on what transpired during the pat search and his prior observations during the traffic stop. In other words, unsatisfied with Reynolds's explanation for the bulge, Orabuena had already decided prior to Reynolds's resistance to detain Reynolds in handcuffs to further investigate the unexplained bulge. The discovery of the methamphetamine was therefore a forgone conclusion. Thus, Reynolds's resistance was neither independent nor intervening, and it was not sufficient to break the causal chain linking the unlawful pat search and the discovery of the challenged drug evidence.

Finally, the third factor, the purpose and flagrancy of the police misconduct, favors suppression. Here, Orabuena could not articulate objective facts supporting reasonable suspicion and admitted he did not know what may have been passed between the vehicle's occupants. "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." (*Elkins v. United States* (1960) 364 U.S. 206, 217 (*Elkins*).) In our view, the substantial lack of justification for the pat search, the close connection between the illegal pat search and the discovery of the drug evidence, and the lack of any exigency or emergency, warrants

22

application of the exclusionary rule.  The decisions cited by the Attorney General, *People v. Prendez* (1971) 15 Cal.App.3d 486 and *People v. Cox* (2008) 168 Cal.App.4th 702, do not compel a finding of attenuation.  In this case, in contrast to *Cox* and *Prendez*, Reynolds did not attempt to flee.  His conduct did not evince a desire to "get as much distance as possible between himself and the police." (*Prendez, supra*, at p. 489.)  Unlike *Cox*, this is "a case where evidence is uncovered following an illegal search," such that "the search itself procure[d] the evidence sought to be excluded." (*Cox, supra*, at p. 712.)  The discovery of the methamphetamine evidence was inevitable once Orabuena conducted the pat search and decided to further detain him.  (See *ibid*.)  Reynolds's conduct subsequent to the pat search was not an independent or intervening circumstance, and thus does not act to dissipate the taint of the illegal search.

In sum, Orabuena's pat search of Reynolds was not supported by reasonable suspicion and the prosecution did not carry its burden of demonstrating abandonment or attenuation.  In finding the pat search unlawful, we are mindful of the admonition that "[t]he judiciary should not lightly second-guess a police officer's decision to perform a patdown search for officer safety.  The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations." (*Dickey, supra*, 21 Cal.App.4th at p. 957.)  However, we are equally mindful that the exclusionary rule serves the vital purpose of "compel[ling] respect for the constitutional guaranty [of the Fourth Amendment] in the only effectively available way—by removing the incentive to disregard it." (*Elkins, supra*, 364 U.S. at p. 217; see *People v. Sanders* (2003) 31 Cal.4th 318, 334.)  Thus, in implementing the rule in this case, we do so to reemphasize that a pat search "is a serious intrusion upon the sanctity of the person" (*Terry, supra*, 392 U.S. at p. 17), and may only be justified when the officer can point to specific and articulable facts which, considered in conjunction with rational inferences to be drawn therefrom, give rise to a reasonable suspicion that the suspect is armed and dangerous. (*Terry, supra*, at p. 21.)

## IV. Disposition[4]

The order denying the motion to suppress is reversed. On remand, the trial court shall permit defendant to withdraw his no contest plea. If he elects to withdraw his plea, the court shall reinstate the dismissed charges and conduct further proceedings in accordance with the law.

---

[4] In his opening brief, Reynolds argues he is entitled to modification of his probationary term based on Assembly Bill No. 1950 (Stats. 2020, ch. 328, § 2) (Assembly Bill 1950). The Attorney General contends that the matter is now moot in light of the superior court's subsequent order to terminate probation based on Assembly Bill 1950. In his reply brief, Reynolds concedes the issue is moot. We concur with the parties, and we take judicial notice of the order terminating probation. We note that the order also granted an expungement under section 1203.4, which does not render the suppression issue moot. (See *People v. Tidwell* (2016) 246 Cal.App.4th 212, 217.)

_____
Wilson, J.


I CONCUR:




_____
Danner, J.




I CONCUR IN THE JUDGMENT ONLY:




_____
Bamattre-Manoukian,  Acting P.J.




H047947 - *The People  v. Reynolds*