Filed 9/5/24  P. v. Smith CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H050966 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 18CR07153) |
| v. | |
| DANIEL MOSES SMITH, | |
| Defendant and Appellant. | |

Convicted of various firearm and drug offenses following his plea, appellant Daniel Moses Smith challenges the trial court's denial of his motion to suppress evidence that the police found in the car that he and codefendant Timothy John Ruelas were detained in.  Smith argues that the officers lacked sufficient cause under the Fourth Amendment to open the car door—revealing a loaded firearm—and that the trial court's reliance on his nervousness, his furtive movements, and his codefendant's attempt to leave discriminates unconstitutionally against people of color.  We affirm the judgment.

## I.     BACKGROUND

### A.     *The Operative Information*

The Santa Cruz County District Attorney charged Smith with the following 13 counts, the first seven of which derive from the November 2018 vehicle search that is

the subject of this appeal: street terrorism (Pen. Code, § 186.22, subd. (a); count 1),[1] two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 2 & 8), carrying a loaded handgun in a vehicle in public (§ 25850, subd. (a); count 3), two counts of having a concealed firearm in a vehicle (§ 25400, subd. (a)(1); counts 4 & 10), unlawful firearm activity (§ 29825, subd. (a); count 5), two counts of possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); counts 6 & 11), possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 7), carrying an unregistered loaded handgun (§ 25850, subd. (a); count 9), misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377; count 12), and misdemeanor possession of heroin (Health & Saf. Code, § 11350; count 13).

As to counts 1 through 5 and 7 through 10, it was further alleged that Smith was armed with a firearm. (§ 1170.12, subd. (c)(2)(C)(iii).) As to counts 1 through 11, it was also alleged that Smith had two prior serious or violent felony convictions (§ 667, subds. (a)(1), (b)–(i)) and that he committed the present offenses while on bail (§ 12022.1).

**B.**      *The Motion to Suppress*

In January 2020, Smith joined in Ruelas's motion under section 1538.5 to suppress evidence found during a vehicle search.

At the hearing on the motion to suppress, Santa Cruz County District Attorney Investigator Ed Delfin testified that he was assigned to the county's anticrime task force, specifically the gang task force. The "main focus" of the gang task force was "to suppress and investigate gang crimes and . . . keep track of the gang members in Santa Cruz County and maybe even in other counties and to suppress gang activities, specifically violent crimes, weapons, all of that stuff."

---

[1] Unspecified statutory references are to the Penal Code.

The night of the search, Delfin was on patrol in an unmarked car driven by Scotts Valley Police Officer Paul Meier when they saw a Ford sedan with a cracked windshield parked facing the officers' path of travel. Delfin recognized Smith in the driver's seat and saw a passenger later identified as Ruelas. Delfin had known Smith for several years from past contacts and knew him to be a Norteño gang member who had been on probation subject to a search condition when Delfin had searched him earlier that year.[2]

Delfin told Meier to stop. Not knowing if Smith was still on probation, Delfin and Meier got out without asking dispatch to check his status, and they approached the car on foot. Besides the cracked windshield, the officers noted the vehicle registration was expired.

As Meier went toward the passenger side, Delfin went to contact Smith, who looked like he was reaching under the driver's side seat; Smith's movement made Delfin suspect that Smith might be trying to conceal something or to reach for a weapon. Delfin characterized Smith's movements as "frantic," suggesting he was reacting "out of panic." Delfin told Smith several times to put his hands up, and Smith's initial failure to comply suggested to Delfin a higher probability that Smith was trying to conceal something.

Smith told Delfin several times that he was not on probation, the repetition of which "in the context of the contact, the furtive movements, all of it" Delfin found "definitely concerning." Delfin thought Smith's voice was "cracking" and that he was "stuttering," which made Smith seem like "a whole different guy" from Smith's "super calm," "cordial," and "respectful" demeanor in their last contact. Delfin assured Smith, "It's okay; we'll clear it up," but still wanted Smith's hands up. "[A] loud bang" from the passenger side alerted Delfin that Ruelas had opened the passenger side door, hitting it against a mailbox in an unsuccessful attempt to get out.

---

[2] At the suppression hearing, the trial court took judicial notice of Smith's prior criminal case, which indicated that his probation had expired on May 6, 2018.

3

Turning back to Smith, Delfin saw that Smith "dip[ped]" his shoulder as though again reaching below his seat. Delfin became concerned that Smith was trying to retrieve a firearm to shoot at the officers. Delfin had found guns on gang members before and knew gang members to commonly use weapons in the commission of crimes. Delfin testified that "at night, . . . two people in the car . . . that just causes a lot of apprehension or at least a lot of concern as far as officer safety and what they are up to because of the environment we are in [and] this particular . . . contact." So Delfin opened the car door and saw a handgun next to the driver's seat. Delfin then directed Smith out of the car and onto the ground at gunpoint.

Meier, called by the defense, largely corroborated Delfin's account. But Meier testified that he noticed even while driving that both occupants of the parked car seemed to be attempting to conceal or access something; Meier surmised they recognized his unmarked car as a police car. Meier testified the reason for contacting the car's occupants was that Delfin believed Smith to be on probation and wanted to "address[] the [Vehicle Code] violations"—the expired car registration and cracked windshield. Meier described Ruelas as "nervous," "clearly anxious that law enforcement was contacting him," and "continually questioning" the need for the contact. On learning that Delfin had discovered a firearm on the driver's side, Meier drew his gun, ordered Ruelas out of the car, and found another firearm on the passenger side floorboard.

The trial court denied the motion to suppress, crediting the testimony of the officers. The court found that by the time the officers were approaching the car, both Smith and Ruelas appeared to know that Delfin and Meier were law enforcement officers. The court found that one officer had recognized Smith as a gang member and was unsure if Smith was still on probation, and at some point officers saw "not just furtive movements" but "reaching down under a seat in a panicked manner" inside the car, either while the officers were driving by or approaching. The court further found that Smith then repeated "in a stressed manner" that he was not on probation, that Ruelas appeared

4

to try to flee, and that Smith again tried to reach under his seat when Delfin's attention was diverted. Thus, based on the "totality of the circumstances," under either a reasonable suspicion or probable cause standard, the trial court found the search was justified.

## C. *The Plea and Sentencing*

In February 2023, Smith pleaded no contest to all counts and enhancements as charged—except for one prior strike allegation that the trial court dismissed under section 1385—and several other charges in another case that is not the subject of this appeal (No. 21CR01737). The trial court later sentenced Smith to 20 years and 4 months in prison.

## II. DISCUSSION

" ' "In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment." ' " (*People v. Flores* (2024) 15 Cal.5th 1032, 1043 (*Flores*); see also *People v. Ovieda* (2019) 7 Cal.5th 1034, 1041 [applying federal constitutional standards to search and seizure issues under the California Constitution].) Smith argues that the federal and state Constitutions required Delfin to have probable cause to open the car door and that the court's reliance on Smith's and Ruelas's reactions to the officers' approach was racially discriminatory and constitutionally inadequate. But Smith overstates the legal standard necessary to justify the search, disregarding the controlling authority of *Michigan v. Long* (1983) 463 U.S. 1032 (*Long*) (permitting a limited search of a car's passenger compartment on no more than reasonable suspicion that its occupant is armed and dangerous). And because the trial court credited the officers' undisputed and facially sufficient account of the circumstances prompting Delfin's search, we see no error in the court's denial of the motion.

5

**A.**     *The Applicable Standard of Reasonable Suspicion*

Although the plain terms of the Fourth Amendment require a warrant issued upon probable cause to search, " 'the ultimate touchstone of the Fourth Amendment is "reasonableness." ' " (*Riley v. California* (2014) 573 U.S. 373, 381.)  Among the exceptions to the requirement of a warrant and probable cause is the search of a car's passenger compartment—"limited to those areas in which a weapon may be placed or hidden"—"if . . . 'specific and articulable facts . . . , taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (*Long*, *supra*, 463 U.S. at p. 1049, fn. omitted; see also *id.* at p. 1035 [analogizing a protective frisk under *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*)]; *People v. Dolly* (2007) 40 Cal.4th 458, 463 [relying on *Long*].)

" 'Because it is a "less demanding" standard [than probable cause], "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." [Citation.]  The standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [Citation.]  Courts "cannot reasonably demand scientific certainty . . . where none exists." [Citation.]  Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." ' " (*Flores*, *supra*, 15 Cal.5th 1032, 1041; see also *Terry*, *supra*, 392 U.S. 1, 27.)  The standard requires "an objective evaluation of the totality of the circumstances . . . confronting both the officer and the citizen." (*Flores*, at p. 1049; *Brigham City v. Stuart* (2006) 547 U.S. 398, 404 [reasonableness under Fourth Amendment judged under objective standard and an "officer's subjective motivation is irrelevant"].)

6

**B.**     *Reasonable Suspicion Justified the Search of the Car for Officer Safety[3]*

Deferring as we must to the trial court's factual findings, we conclude that specific and articulable facts supplied the officers with reasonable suspicion that Smith was armed and dangerous.  (See *Long*, *supra*, 463 U.S. at p. 1049.)

Recognizing that "[i]t is the trial court's role to evaluate witness credibility, resolve conflicts in the testimony, weigh the evidence, and draw factual inferences" (*People v. Lee* (2019) 40 Cal.App.5th 853, 860), we note the trial court credited Delfin's testimony that he knew Smith was a Norteño gang member who had recently been on probation.  (*In re H.M.* (2008) 167 Cal.App.4th 136, 148 [fact that minor had previous contacts with police and was known to officers reasonably added to suspicion that minor was involved in criminal activity, justifying pat search]; *United States v. Bishop* (11th Cir. 2019) 940 F.3d 1242, 1249, fn. 4 [defendant's criminal history may be given little weight but can be considered in totality with other relevant factors in justifying pat search]; *United States v. Hammond* (10th Cir. 2018) 890 F.3d 901, 907 [criminal history can be "critically relevant" for *Terry* purposes to justify pat search]; *United States v. Garcia* (10th Cir. 2006) 459 F.3d 1059, 1067 [although not determinative, "gang connection further supports the reasonableness of a weapons frisk of" individuals present at scene].)

The court also credited Delfin's testimony that he believed Smith was trying to conceal evidence or a weapon inside the car, finding that there were "not just furtive movements; they're specifically reaching down under a seat in a panicked manner."

---

[3] We do not address the Attorney General's claim that the officers' initial contact with Smith and Ruelas was consensual, because Smith challenges only the search of the car by opening the driver's side door.  We assume for purposes of this appeal that gang task force officers enforce Vehicle Code infractions as a means of furthering other investigation not limited to traffic matters, but the United States Supreme Court long ago deemed such traffic stops reasonable, so long as the stop was grounded in probable cause to believe a traffic violation had occurred.  (*Whren v. United States* (1996) 517 U.S. 806, 814–815; *People v. Esparza* (2023) 95 Cal.App.5th 1084, 1094.)

Delfin had earlier described Smith as reaching under the driver's side while appearing "frantic" and reacting "out of panic." (See *People v. Clayton* (1970) 13 Cal.App.3d 335, 337 [holding that a defendant's "unusual movements within the car" contributed to the reasonableness of the search, as "failure to take similar precautions has resulted in the death of many law enforcement officers"]; *United States v. Nash* (7th Cir. 1989) 876 F.2d 1359, 1361 [holding that officer reasonably believed search was necessary given the driver's "furtive gesture" when police car pulled up behind him].) Delfin had also earlier testified about his familiarity with Smith and his perception that Smith's "cracking" voice and "stuttering" were uncharacteristic of him. (See, e.g., *In re H.M.*, *supra*, 167 Cal.App.4th at p. 144 [nervous and evasive behavior pertinent in determining reasonable suspicion]; *Illinois v. Wardlow* (2000) 528 U.S. 119, 124–125 [same].) Smith also did not initially comply with Delfin's request for him to put his hands up, which Delfin testified heightened his concern.

The trial court further credited Meier's similar claim that Smith and Ruelas appeared to conceal or access something inside the car: "Both officers say they see similar behavior" by the two defendants, which "rais[ed] a suspicion in these experienced officers that . . . there are weapons or some other kind of . . . contraband in the place where both of these people in the car are reaching."

Finally, the trial court also credited the officers' description of Ruelas's "possible flight" and Delfin's claim that Smith took the opportunity of this distraction to again attempt to reach towards the seat. (*United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 885 ["obvious attempts to evade officers can support a reasonable suspicion"]; *People v. Souza* (1994) 9 Cal.4th 224, 235 [flight from police can be a proper consideration in whether officers have sufficient cause to detain an individual].)

Smith (identified in the probation report as "Hispanic") nonetheless argues that his nervousness and Ruelas's attempted flight cannot properly be considered without

8

unconstitutionally discriminating against people of color.[4]  Because "[n]ervousness is a common and entirely natural reaction to police presence," furtive movement alone may not raise a reasonable suspicion of criminal activity.  (See, e.g., *United States v. McKoy* (1st Cir. 2005) 428 F.3d 38, 40; *United States v. Fernandez* (10th Cir. 1994) 18 F.3d 874, 879 [reliance on a person's nervousness should be treated with caution as "most citizens, . . . whether innocent or guilty" may exhibit signs of nervousness].)  "[M]any individuals—including, particularly, people of color—commonly hold a perception that engaging in any manner with police, including in seemingly casual or innocuous ways, entails a degree of risk to one's safety." (*Flores*, *supra*, 15 Cal.5th at p. 1053 (conc. opn. of Evans, J.).)  Avoiding law enforcement may for many simply reflect "a desire to avoid risking injury or death." (*Id.* at p. 1054 (conc. opn. of Evans, J.).)  Indeed, "[w]hile the evaluation of whether an individual's behavior supports a finding of reasonable suspicion is an objective one, a test that fails to account for the realities of so many Californians would not be a reasonable one." (*Id.* at p. 1055 (conc. opn. of Evans, J.).)

But given the trial court's acceptance of the officers' testimony, this is not a case of officers detaining a stranger solely because he was nervous or tried to avoid consensual contact, as in *Flores*.  (*Flores*, *supra*, 15 Cal.5th at pp. 1039, 1045.)  Smith's expired registration and cracked windshield having supplied a basis to detain, Delfin

---

[4] The Attorney General argues in the reply brief that this argument has been forfeited due to Smith's failure to object to these factors on the basis of race in the trial court.  Generally, "once the prosecution has offered a justification for a warrantless search or seizure, defendants must present any arguments as to why that justification is inadequate." (*People v. Williams* (1999) 20 Cal.4th 119, 130.)  The burden of proof is still on the prosecution, as "the burden of raising an issue is distinct." (*Ibid.*)  "But, if defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the evidence or risk forfeiting the issue on appeal." (*Ibid.*)  Based upon our review of the record, we see no instance where Smith or Ruelas challenged the search on the basis of race, or that nervousness and flight should have been given minimal weight given their ethnicity.  But assuming no forfeiture occurred, we address the merits of Smith's arguments here.

could consider the totality of the circumstances, including Smith's reactions during the contact and what he knew of Smith, in determining whether it was reasonable to suspect Smith was armed and dangerous. Smith cites no authority prohibiting the officers or the trial court from considering a detainee's nervousness and attempted flight as among the totality of relevant circumstances.[5] And the trial court found that Delfin—rather than profiling a stranger based on assumptions about race, ethnicity, or reactions amounting to their proxy—opened the car door based on how Smith's noncompliance and panic differed from how Smith himself had reacted the last time Delfin had searched him. On this record, the consideration of Smith's behavior was sufficiently individualized. (Cf. *Flores*, at p. 1049.)

Arguing that probable cause was required for Delfin to open the car door, Smith ignores *Long* and relies instead on *Arizona v. Hicks* (1987) 480 U.S. 321. In *Hicks*, the United States Supreme Court found that an officer's movement of some stereo components so that he could read and record their serial numbers constituted a search under the Fourth Amendment. (*Hicks*, at pp. 324–325.) The high court further found that the officer's reasonable suspicion that the stereo components were stolen did not entitle him to seize them under the "plain view" doctrine to confirm his suspicions; probable cause was necessary. (*Id.* at pp. 326–327.) But the plain view doctrine is an unrelated "exception to the general rule that warrantless searches are presumptively unreasonable . . . ." (*Horton v. California* (1990) 496 U.S. 128, 133, fn. omitted.) *Hicks* and its

_____

[5] Smith in his reply brief notes the California Racial Justice Act, effective January 1, 2021, added section 745 with the intent " 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' " (*Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 123.) Under section 745, subdivision (a)(1), a violation of the Act can be proved if "a law enforcement officer involved in the case . . . exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." Nothing in the Act, however, forecloses consideration of the defendant's demeanor and behavior the trial court found the officers to have observed here.

limitation on the plain view doctrine thus cast no doubt on our adherence to *Long* and its reasonable suspicion standard.

In the alternative, Smith argues that the search was unreasonable in that Delfin could have ordered him out of the car rather than independently opening his car door. Citing *Florida v. Royer* (1983) 460 U.S. 491, Smith argues that Delfin's opening the door was not "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (*Id.* at p. 500.) Under the Fourth Amendment, "[t]he scope of [an investigative] detention must be carefully tailored to its underlying justification." (*Royer*, at p. 500.) An officer detaining a driver may order the driver out of car, because doing so has been held to be a de minimis additional intrusion. (See *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111.) But the Supreme Court in *Mimms* authorized law enforcement to order a detained driver to leave the car; it did not purport to require this measure. And neither *Royer* nor *Mimms* prescribes the scope of a protective search of a driver reasonably suspected of being armed and dangerous: the scope of such a search is defined by the area to be searched (the passenger compartment) and the permitted purpose (finding the suspected weapon). (*Long*, *supra*, 463 U.S. at p. 1051 [deeming a passenger compartment search " 'strictly circumscribed by the exigencies which justifi[ed] its initiation' "].) The necessary balancing of intrusion and justification "clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as [officers] possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." (*Ibid.*)

Deferring as we must to the trial court's factual findings, we conclude that the search was reasonable under the circumstances and that the trial court did not err in denying the motion to suppress.

## III.  DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:


_____

GROVER, Acting P. J.


_____

BROMBERG, J.


*People v. Smith*
H050966